FILED
2024 Jun-10 PM 01:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

1:20-cv-01815-CLM-SGC

ANTWON D. JENKINS,

Plaintiff,

vs.

UNITED STATES OF AMERICA,

Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S OFFICIAL TRANSCRIPT OF BENCH TRIAL
MAY 13, 2024

UNITED STATES COURTHOUSE
1100 GURNEE AVENUE
ANNISTON, ALABAMA 36201

BEFORE THE HONORABLE COREY L. MAZE
UNITED STATES DISTRICT JUDGE

COURT REPORTER:
Carrie M. Robinson, RMR, CRR, CRI
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205)278-2063

(Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.)

# A P P E A R A N C E S

FOR THE PLAINTIFF:

KIRA Y. FONTENEAU
LACEY WILSON
Attorneys at Law
Barrett & Farahany
2 North 20th Street
Suite 900
Birmingham, Alabama 35203
Fonteneau@justiceatwork.com
lacey@justiceatwork.com

FOR THE DEFENDANT:

JACK B. HOOD
GRACE J. POSEY
United States Attorney's Office
Northern District of Alabama
1801 Fourth Avenue North
Birmingham, Alabama 35203
Jack.hood@usdoj.gov
Grace.posey@usdoj.gov

ALSO APPEARING:

ANTWON D. JENKINS

LATEASE BAILEY-CLOSE, BOP

# I N D E X


PAGE

OPENING REMARKS BY MS. FONTENEAU . . . . . . . . . . . . . . 8

OPENING REMARKS BY MS. POSEY . . . . . . . . . . . . . . . . 11

EXAMINATION INDEX

EUELL WAYNE HARVELL

DIRECT BY MS. FONTENEAU . . . . . . . . . . . . . . . 29
BY THE COURT . . . . . . . . . . . . . . . . . . . . 60
CROSS BY MS. POSEY . . . . . . . . . . . . . . . . . 66
REDIRECT BY MS. FONTENEAU . . . . . . . . . . . . . . 83
FURTHER BY THE COURT . . . . . . . . . . . . . . . . 89
FURTHER REDIRECT BY MS. FONTENEAU . . . . . . . . . 91
FURTHER RECROSS BY MS. POSEY . . . . . . . . . . . . 92
FURTHER REDIRECT BY MS. FONTENEAU . . . . . . . . . 92

LIEUTENANT WILLIAM EPPS, JR.

DIRECT BY MR. WILSON . . . . . . . . . . . . . . . . 94
CROSS BY MR. HOOD . . . . . . . . . . . . . . . . . . 107
BY THE COURT . . . . . . . . . . . . . . . . . . . . .107
REDIRECT BY MS. WILSON . . . . . . . . . . . . . . . .109
RECROSS BY MR. HOOD . . . . . . . . . . . . . . . . . 110
FURTHER REDIRECT BY MS. WILSON . . . . . . . . . . . 111

ANTWON DESHANE JENKINS, JR.

DIRECT BY MS. FONTENEAU . . . . . . . . . . . . . . . 114
CROSS BY MR. HOOD . . . . . . . . . . . . . . . . . . 157
BY THE COURT . . . . . . . . . . . . . . . . . . . . .171
REDIRECT BY MS. FONTENEAU . . . . . . . . . . . . . .177

P R O C E E D I N G S

May 13, 2024 8:30 a.m.

THE COURT: This is Case Number 1:20-1815, Antwon Jenkins versus the United States of America.

Mr. Jenkins is here with us.

Who is here on behalf of the plaintiff today?

MS. FONTENEAU: Good morning, Your Honor. Kira Fonteneau and Lacey Wilson for Mr. Jenkins.

THE COURT: All right. Good morning to you both.

Who is here on behalf of the government?

MR. HOOD: Jack Hood, Assistant United States Attorney, along with Grace Posey, Assistant United States Attorney, for the defendant, the United States.

THE COURT: All right. Who do you have as your representative today?

MR. HOOD: Latease Bailey-Close from Atlanta, Georgia, with the BOP.

THE COURT: All right. Good morning to you as well.

Very good. So we are here for trial. This is a bench trial, so we will not be selecting a jury today.

Because Mr. Jenkins is the plaintiff, he will go first. That said, as I told the parties, if they would like to get up and give an opening statement just to tell me what they expect to show over today or the next few days, then they are certainly allowed to do so.

And, Ms. Fonteneau, that means you get to go first.

MR. HOOD: Judge, one point of order.

THE COURT: Okay.

MR. HOOD: I take it that the exhibits have already been moved into evidence; is that correct?

THE COURT: They have not officially. If y'all want to do that first, that is fine.

MR. HOOD: Yes.

THE COURT: I have a binder of joint exhibits with the joint exhibit list, and I have being the joint exhibits Exhibit 1 through 23.

All right. Ms. Fonteneau, at this time, do you want to move in Exhibits 1 through 23?

MS. FONTENEAU: Yes, Your Honor.

THE COURT: Any objection, Mr. Hood?

MR. HOOD: Not at all.

THE COURT: All right. Exhibits 1 through 23 are admitted.

How about Defendant's Exhibit 207? Is there an objection to that, Ms. Fonteneau?

MS. FONTENEAU: Yes, we reassert the same objections we did in our motions in limine.

THE COURT: All right. I am going to overrule those for the same reasons and also admit Government's Exhibit 207.

MR. HOOD: Judge, I have one other matter.

THE COURT: Okay.

MR. HOOD: There is an exhibit that's listed in the Bates as Jenkins 161, and what it is, is Psychological Services' review of Mr. Jenkins while he was in the SHU.

THE COURT: Okay.

MR. HOOD: And I think it is very important in the sense that he is claiming mental anguish and all those things. And this is an evaluation that actually occurred of him by Dr. Andrew Anderson, who was a psychologist at the time, and his report is at that. And we would like to add that as Government's Exhibit 209. He actually interviewed --

MS. FONTENEAU: Your Honor, I would --

THE COURT: Hold on. Let Mr. Hood finish, and then, Ms. Fonteneau, I will get any objections.

MS. FONTENEAU: Well, the objection is him talking about what is actually in the record -- I mean, in the record specifically.

THE COURT: Okay. It is not in my folder, correct?

MS. FONTENEAU: Correct.

THE COURT: Do you have an extra copy?

MR. HOOD: I have an extra copy if you would like it.

THE COURT: If you will give that to Tori.

Ms. Fonteneau, obviously you have seen that before today.

MS. FONTENEAU: I have seen it before, Your Honor. It was not disclosed as an exhibit for today.

THE COURT: Okay. All right. Let's do this, Mr. Hood. Rather than -- I am assuming, Ms. Fonteneau, you are going to have an objection to it.

MS. FONTENEAU: Yes, Your Honor.

THE COURT: All right. Mr. Hood, which witness do you think you are going to attempt to introduce this through? When do you think it is going to come up?

MR. HOOD: The plaintiff.

THE COURT: All right. And he is not our first witness, correct, Ms. Fonteneau?

MS. FONTENEAU: Correct, Your Honor.

THE COURT: He's your last witness, right?

MS. FONTENEAU: That's right, Your Honor.

THE COURT: So let me do this: When we take a break today, I am going to read through it, and then we will discuss it after the break just -- because I haven't seen it before, I just want to get more acclimated to what it says and what the arguments are, all right?

All right. Anything else, Mr. Hood?

MR. HOOD: No, Your Honor. That's it.

THE COURT: All right. Ms. Fonteneau, the floor is yours.

MS. FONTENEAU: Thank you, Your Honor.

May it please the Court

THE COURT: It does.

MS. FONTENEAU: Your Honor, this case is cut and dry. We are not here today to discuss any very esoteric issues of law. It is an issue of fact about whether SIS Harvell and Epps violated their duty as officers to properly administer a NIK kit test when, on November 1st, 2016, they confiscated a piece of brown paper from Mr. Jenkins and then initiated proceedings that would cause him to go to the SHU, the segregated housing unit.

Under the Federal Tort Claims Act, we expect to show that -- and I believe it is undisputed -- that a piece of paper was confiscated from Mr. Jenkins. It was brown in color. It was taken -- a small snippet of that piece of paper was taken off of it. It was placed into a solution and then placed into a second solution which indicated to them that there was, perhaps, a positive indication for amphetamine.

However, we also believe that the evidence will show, and it is clearly documented in the NIK test procedures -- and you will see those in a little bit of time -- the NIK test procedures say you should never use brown paper in a NIK kit test. In fact, those instructions will also show that what they were supposed to do, if they could not use the test to create a presumptive result, is to send the test off -- send the sample off for independent testing.

I think the record will reflect that NIK kits provide a presumptive test result. They do not provide a conclusive test result. And, therefore, if you are to use it for a law enforcement purpose, the NIK test should be confirmed by an actual lab test. That was not done here. And I think the evidence will show that -- or I think the defense will say, well, the instructions don't say what to do. But that is not true. And you will see the evidence, and it says, in effect: Never use brown paper. So they cannot meet their burden.

Under the Federal Tort Claims Act, we need to establish that they had a duty. We will show that Harvell and Epps are corrections officers and that part of their duties is to test and provide information about their -- the results of tests or presumptive results of tests as part of their duties. And as part of those duties, they also have to perform those tests in a workmanlike fashion to allow those tests to be relied upon.

The evidence will show that the test absolutely said never use brown paper and that Harvell used brown paper for the test. That -- and that will establish that there was a duty, and there was a breach of that duty.

Now, the evidence will also reflect that Mr. Jenkins then went on to be placed in the SHU for 45 days, okay? And it was the result of that testing and that failure to test

that caused Mr. Jenkins to go into the SHU. And while he was there, he suffered several losses. And what we will prove is that Mr. Jenkins suffered medical distress because he had -- excuse me, because he had two asthma attacks related to his time in the SHU and that he also suffered the conditions of being in the SHU which were -- you will hear evidence -- that were unsanitary and claustrophobic and overly heated or also subjected him to times when he was actually not having the appropriate amount of heat. And also, it will show that he had staph infection that he caught while he was in the SHU. None of those things, the evidence will show, would have happened had he stayed in general population.

And so we believe we can show a duty, the duty to perform the tests in the way that it should have been; a breach of that duty, a clear undisputed breach of that duty; a cause of that harm, him going into the SHU; and harm. He had physical harm, and he had mental distress. And so we expect at the end of the day to ask this Court to rule in favor of Mr. Jenkins and against the United States.

THE COURT: All right.

MS. FONTENEAU: One more thing: I believe we may have some witnesses in here.

THE COURT: Yeah, we are going to invoke the rule as soon as we are done with the statements.

MS. FONTENEAU: Okay.

THE COURT: All right. Mr. Hood, do you want to make any statement? Ms. Posey?

MS. POSEY: Yes, Your Honor.

THE COURT: All right.

MS. POSEY: And if we could have it projected onto the -- yes, for that laptop (indicating).

Good morning, Your Honor.

THE COURT: Good morning.

MS. POSEY: My name is Grace Posey. I am an Assistant United States Attorney representing Defendant United States of America in this case, if it please the Court.

THE COURT: It does.

MS. POSEY: Your Honor, the evidence will show that during this time period, the Federal Bureau of Prisons was battling the introduction of a drug known as K2/Spice into its prisons. And K2/Spice is synthetic marijuana.

Paper would be soaked in this K2/Spice and then mailed to -- sent to inmates through the mail.

And Mr. Harvell, the SIS technician in this matter, will testify that prior to finding this piece of brown paper on Mr. Jenkins, there were 14 inmates at FCI Talladega who were hospitalized at the same time as a result of smoking this unknown substance that they said was K2/Spice.

The Bureau of Prisons has a clear duty to provide safekeeping and protection of inmates. And as Ms. Fonteneau

said in her opening, it is not disputed that part of that duty includes testing for drugs and includes detecting and deterring inmate drug use.

Your Honor, this case is about the BOP doing what was practical to fulfill this duty, to keep inmates safe, and to combat the introduction of this drug into its prisons.

What happened in this case is not disputed. On November 1st, 2016, at around 6:00 p.m. in the evening, a correctional officer did a random pat search of the plaintiff in this case Mr. Jenkins.

He found this (indicating), a piece of brown paper soaked in some substance.

The correctional officer took this to the special investigative services, or SIS, office. The SIS technician Mr. Harvell did a drug test, and the results indicated the presence of amphetamine.

After a disciplinary hearing, Plaintiff was then sanctioned with 30 days in the special housing unit, or SHU, and he also lost visitation rights for six months and lost 41 days of good conduct time credits.

Now, Plaintiff's central allegation is that the drug test was not properly administered, so I want to spend some time talking about it.

So when Mr. Harvell tested this piece of brown paper soaked in some substance, he used a narcotics identification

kit, or NIK, test. And as Ms. Fonteneau said, this is a presumptive field test.

And the way the test works is that you have a test pouch or bag, and it has chemicals in it. And within that test pouch, you also have ampoules that have a second set of chemicals.

(Telephonic interruption)

THE COURT: Let's hold on a second, Ms. Posey.

Do we know where it is coming from?

(Discussion off the record)

THE COURT: Continue.

MS. POSEY: Yes, Your Honor.

So the way this NIK test works is that you take your sample and you put it inside this test pouch that has chemicals in it. You break the ampoules, and you watch to see what color it changes, it turns. And based on what color it turns, you go to a second test and -- to narrow down what the drug is.

So in this case, Mr. Harvell put a piece of the brown paper soaked in something taken from Mr. Jenkins in Test Kit A. It turned orange to brown within 10 to 12 seconds. And so based on this flowchart, he went to Test U. Put another sample from this brown piece of paper soaked in something in test Kit U, broke the ampoules, and it turned red which indicated that it was negative for methamphetamine.

Now, on the back of this flowchart, there are also general instructions. And Plaintiff will argue that Mr. Harvell negligently or intentionally did not follow some of these instructions when he did the test.

Specifically, under the general polytesting procedures, it says, Before testing can begin, it is important to classify the material using one of the classifications below. And it lists tablets, capsules, powders, plant material, and then it has this instruction: Liquid samples. It says, NIK tests are not designed for use with liquid samples; however, liquids may be tested by placing the tip of a substance-loading device piece of paper into the liquid. Remove and allow to air dry. Place the dry paper into the test pack, and proceed with the test as instructed. The choice of paper is critical. Unscented, uncolored filter paper is ideal. Never use brown paper hand towels or newsprint.

So Plaintiff will argue that this was the instruction that was not followed when they -- Mr. Harvell tested the sample taken from Mr. Jenkins. However, there are several problems with Plaintiff's case.

First, the sample taken from Mr. Jenkins is not a liquid. It is a piece of brown paper soaked in something. So the test instructions that define it as liquid samples, this is not a liquid sample.

THE COURT: All right. Go back to the instruction.

Okay. Go ahead. I just want to read that as you are talking.

MS. POSEY: Yes, Your Honor.

So this is for liquid samples. And in this case, the sample is not a liquid. It is a piece of brown paper soaked in something. So the instructions simply don't exactly fit the situation here.

Mr. Harvell will also testify that he could not get that substance, whatever he was trying to test for, off the piece of brown paper. So his options were to proceed with the NIK test with this piece of brown paper with the backdrop that, you know, the Bureau of Prisons is fighting this introduction of K2/Spice that is being soaked on paper into the prison, or he could have not tested the sample at all.

Plaintiff also has another problem. There is no evidence -- there will be no evidence to show whether scientific or otherwise that the presence of brown paper causes a false positive.

So based upon the evidence presented by Plaintiff in his case in chief, Plaintiff will not be able to prove liability or damages on either of his claims.

And Plaintiff's two remaining claims are negligence and malicious prosecution.

So the government maintains that Plaintiff won't be

able to prove any of the elements of his claim, but particularly Plaintiff will not be able to prove that he suffered a loss or injury, and he will not be able to prove causation.

On December 9, 2016, when Mr. Jenkins was in the SHU, he complained of shortness of breath and was seen at two different times by two different nurses and they refilled his asthma inhaler. Other than that, there are no -- there's no medical records showing that he suffered mental anguish while he was in the SHU or afterwards, and there are no medical records that evidence that he had any sort of skin infection or staph infection.

Plaintiff also will not be able to show that he -- will also not be able to show causation. So in order for Plaintiff to succeed on his negligence claim, he has to show that, you know, the presence -- testing this brown piece of paper that was soaked in some substance was a violation of these NIK instructions which caused a false positive which led to him being sanctioned with segregation in the SHU without justification which led to his alleged injuries, which, again, he won't be able to prove.

And, Your Honor, the connection between his alleged injuries and that brown piece of paper is simply too remote.

Plaintiff also will not be able to prove his malicious prosecution claim. He won't be able to meet any of

the elements. But, again, he particularly won't be able to meet the first two.

So for the first element of a malicious prosecution claim, he has to show that there was a prior judicial proceeding. Here, it was a disciplinary proceeding. It was an administrative proceeding. It wasn't a criminal or a judicial proceeding. So his malicious prosecution claim fails at the first element.

That said, he also won't be able to prove the second element which is that the United States acted with malice and without probable cause.

First of all, Mr. Harvell and Mr. Epps will testify that they had no ill will toward Mr. Jenkins. And here, there was probable cause because there was a positive drug test.

At the end of Plaintiff's case in chief, Defendant United States will move for a judgment as a matter of law and request that the Court rule in Defendant's favor and dismiss Plaintiff's claims with prejudice because Plaintiff will not be able to prove his case.

THE COURT: All right. Can you do me a favor? Can you go back to a clean version of the instructions? Are you controlling the PowerPoint?

MS. POSEY: Yes. Yes, Your Honor, I am.

THE COURT: If you can go back about half-way, that -- yes, exactly like that.

Ms. Fonteneau, what is your argument going to be on how the officials should have tested the paper? I mean, I know your argument is under the liquid sample portion of the instructions, they should not have used brown paper, but the Government's point is: This is saying if you have a liquid sample, don't dip brown paper into the liquid and then test it, correct? That's the government's position.

MS. POSEY: Yes, Your Honor.

THE COURT: All right. Ms. Fonteneau, what is the argument or what position are you going to take on how they should have tested it, if at all, in this instance?

MS. FONTENEAU: Your Honor, the testimony in the depositions was that it was a liquid substance, and so this is the policy that they should have done. And so -- and the instructions for the NIK kit or the instructions for NIK testing show that it is a presumptive test. And if you can't get a good test here, you need to do a lab test. And so that -- they should not have used the NIK test at all. They should have used a proper lab test to determine what was on the paper.

THE COURT: Well, what if the field test, the NIK test gives a presumptive positive? Would that not be at least enough to move further for other testing?

MS. FONTENEAU: It could have been. They should have. But they did not test it further. So even if it was a

presumptive -- one, you know, we would ask for an expert who was a chemist so we could talk about the -- so we are here without the expert that could have explained how the tests work.

THE COURT: Right.

MS. FONTENEAU: And, I mean, I can tell you kind of what she would say which is that what they did -- well, Your Honor, can we have --

THE COURT: Yeah, let's go ahead and invoke the rule.

Who is going to be our first witness?

MS. POSEY: Mr. Harvell, Your Honor, I believe.

THE COURT: Mr. Harvell is going to be the first witness.

MS. FONTENEAU: Can we argue without him here?

THE COURT: Yeah, let's do this: Anybody who is going to testify, let's go into one of the witness rooms. In fact, there's one right outside the door. If you go through those double doors to the left, there is a room. Y'all wait there, and then, Mr. Harvell, we will come get you as soon as we are ready, which is probably five minutes from now.

MR. Harvell: Yes, sir.

(Mr. Harvell exits courtroom)

THE COURT: All right. You can continue.

MS. FONTENEAU: All right. So she won't be here

today, but our expert witness would have testified that what they actually did when they put the brown piece of paper in is they burnt up the sample because there was a reaction with the chemicals that caused that. And you can -- when you look at it, you will see that it looks like little pieces of soot and things have come off of it. And so what they did, they didn't really get the result that they think they got from it. They just misread the test, essentially, and so nothing that they did after that is accurate because the test, these presumptive tests, are kind of A or B. Either it is the thing you are testing for or it is something else. And so in the second test that they used, the burgundy test, it isn't really the test they used for amphetamine. It is the test to exclude -- to presumptively test methamphetamine, which are two different compounds.

THE COURT: All right. Ms. Posey, go back to the -- go back to the flowchart.

MS. FONTENEAU: If there's another --

THE COURT: All right. So --

MS. FONTENEAU: There is another test for amphetamine.

THE COURT: But my understanding is you do the "A" test and it shows one of these colors, and it showed orange.

Is that -- everybody agrees with that?

MS. FONTENEAU: They said orange then brown. And

then the testimony is orange, brown, then black. It is not orange then brown alone. And so what happened is --

THE COURT: Where does black show up on the flowchart? I see orange then brown.

MS. FONTENEAU: Exactly.

THE COURT: To me, I read the flowchart to say: If you get orange that turns to brown, then you use the "U" test to see if it turns either red or blue.

Is that -- I'm reading that correctly?

MS. FONTENEAU: Right. And there are times when the test will turn three colors. So if you look on the far corner, when you go to "A," there is -- it's kind of a yellow then brown, then purple. There are times when it turns three colors. This is a time where it turned three colors and went orange, brown, then black, which is not accounted for, which kind of indicates, at least from our perspective, that the Court could infer that the test was done improperly and so the result is not good.

THE COURT: Now, why would it turn black other than just time has passed?

MS. FONTENEAU: That is not something that the instructions say it would do; and in fact, it is consistent with the paper burning.

THE COURT: Ms. Posey, are you going to have evidence as to orange then brown -- first of all, is it

undisputed that it went orange, brown, black?

MS. FONTENEAU: That's what the test --

MS. POSEY: Yes.

THE COURT: Ms. Posey, is that -- everybody agrees with that?

MS. POSEY: Yes, Your Honor.

THE COURT: All right. So what is the explanation for the black at the end?

MS. POSEY: I believe Mr. Harvell will testify that anything you put in Test Kit A, if you leave it in there long enough, it is going to turn black.

THE COURT: Okay. All right. So at that point, because he sees orange then brown, then that is why he comes to here (indicating), correct?

MS. POSEY: Yes, Your Honor.

THE COURT: All right. So what color does it turn in the "U"?

MS. POSEY: The reddish color.

THE COURT: The reddish color, which is why -- amphetamine, not methamphetamine.

MS. POSEY: Yes, Your Honor. But as Ms. Fonteneau explained -- that -- Test U is really to eliminate that it is methamphetamine.

THE COURT: Right. But if it turns red, that is considered a positive for amphetamine or it's just simply a

negative for methamphetamine.

MS. POSEY: Negative for methamphetamine.

THE COURT: Because I guess the belief is if it's orange, then brown, then you know it's some sort of amphetamine. You are just trying to determine if it is meth?

MS. POSEY: Yes, Your Honor.

THE COURT: And Ms. Fonteneau may seem to disagree with that.

MS. FONTENEAU: I mean, this is where the expert testimony would be helpful. There is an actual -- another test there for amphetamine, so that would actually be presumptive positive on amphetamine.

THE COURT: And that would be -- I am looking for amphetamine.

MS. FONTENEAU: "W."

THE COURT: Okay. So if it had been -- what color? Brown then brown over here (indicating)?

MS. FONTENEAU: Let's see here. Yeah, it's "W," so I guess that would be brown then brown.

THE COURT: If you had a brown then brown, then you would do Test W, and then it's green if it's amphetamine and then nothing if --

MS. FONTENEAU: Because there are different chemicals, and the chemicals can react on -- and the chemicals can react on different compounds, similarly. And so really

you can't rely -- at least as we read it, you can't rely on what the color is to determine what the substance is. You have to, like, continue to test. And the instructions say, Test more times; test often. But in this case, it was not a -- we didn't have the color signature for amphetamine in the beginning, so we can't now say, oh, it didn't trigger amphetamine. And so now it has to be because it triggered methamphetamine.

THE COURT: They have the color signature for methamphetamine to start with.

MS. FONTENEAU: Correct.

THE COURT: Okay. And then your argument would be that it tested negative for methamphetamine because it didn't turn blue.

MS. FONTENEAU: Exactly. And it didn't test positive for amphetamine because it didn't turn brown, brown.

THE COURT: Because they didn't do the "W" test.

MS. FONTENEAU: Right. And it didn't turn brown then brown.

MS. POSEY: Your Honor, this is all -- I would object. This is all purely speculative.

THE COURT: Well, this is -- this is just opening statements to help me understand the parties' position. I am not saying that she has proved any of it. I am just trying to understand what her argument is going to be.

MS. POSEY: I understand, Your Honor. It's just she is saying what her expert would have said. In this case, she specifically -- well, we are not challenging Your Honor's ruling to exclude experts, but she did specifically ask our expert witness: Why do the instructions say never use brown paper? He provided an answer. It is not that it results in a false positive. But, you know, to the extent we are getting into what her expert would have testified to I think --

THE COURT: Well, again --

MS. POSEY: -- has already been excluded.

THE COURT: -- the point of the -- the claims that are going forward are focused on the actions of the two officers who were there.

MS. POSEY: Yes, Your Honor.

THE COURT: I mean, did they breach a duty, and did they act with malice or without probable cause? So what I am testing as a matter of fact is what they knew, what they did, what their training was. So that's why it's not necessarily what the expert would say but what they knew, what they did, and how this works.

I'm just trying to understand y'all's position on how the chart worked and how they should have understood it to work.

MS. POSEY: Okay. Yes, Your Honor.

THE COURT: So we went orange to brown; and then at

some point after brown, it went black.

Everybody agrees with that, correct?

MS. FONTENEAU: Right.

MS. POSEY: Yes, Your Honor.

THE COURT: And then everybody agrees that we did the "U" test, and the "U" test did not turn blue which would mean it was not a positive for methamphetamine, that maybe there's a suggestion of amphetamine based on the red, but that was never fully proved because we didn't put the brown paper in the "W" test to see if it turned green for amphetamine.

And I am not saying the government agrees that they needed to do that, and I understand that one of the issues here is it's not like you had a full cup of liquid where you could continue doing testing over and over. You have a brown piece of paper; and ultimately, that paper is going to get used up. You have a limited supply.

So your argument, I am assuming, is going to be: They did the best they could with the small sample they had. Is that fair?

MS. POSEY: Yes, Your Honor. And I believe their position is that, you know, they should have sent it out to an outside lab. Within the Bureau of Prisons context, I don't -- you know, it is different from, you know, a Fourth Amendment probable cause context, Your Honor, where maybe secondary evidence would be necessary. But here the presumptive test is

kind of the standard practice.

THE COURT: Okay. All right. I understand where you are both coming from.

MR. HOOD: Can I mention one other thing?

THE COURT: You may.

MR. HOOD: I thought I heard Ms. Fonteneau say in her opening that they were challenging the condition of the SHU, and I think your order of March the 20th on our discretionary function motion took out sanitation of the SHU.

THE COURT: Well, she's going to be allowed to do it to the extent that the government has argued that there's a disconnect on probable -- excuse me, on proximate cause. I mean, Ms. Fonteneau is going to have to show that his being put in the SHU because of a bad test caused his injuries. So she's going to have to put on some evidence that the conditions were the cause, correct, Ms. Fonteneau?

MS. FONTENEAU: Yes, Your Honor.

THE COURT: So for that purpose, I will allow her to get into it. I'm not saying it is a standalone claim, but she does have the responsibility, because she is the plaintiff, of proving or connecting the test with the injury.

All right. I am ready for the first witness.

MS. FONTENEAU: Thank you, Your Honor.

MS. POSEY: Thank you, Your Honor.

THE COURT: Thank you.

MS. FONTENEAU: We call SIS Tech Harvell.

THE COURT: All right. If someone will go get -- is it officer? How --

MS. FONTENEAU: He's retired now.

THE COURT: Okay. So just Mr. Harvell? Does everybody agree with that?

MS. POSEY: Yes. Mr. Harvell will be fine, Your Honor.

THE COURT: Does the government mind sending an email copy of this presentation to Tori with Ms. Fonteneau copied, just the same email address that we have been using, but I do want to have a copy of this as well.

MS. POSEY: Yes, Your Honor. And, Your Honor, all of these are exhibits in the joint exhibit binder as well.

THE COURT: They are. Okay.

All right. Sir, if you will, come around that corner and all the way around; and when you get to the chair, just remain standing behind the chair.

All right. Ms. Ana.

COURTROOM DEPUTY: Raise your right hand.

(Witness sworn)

THE COURT: All right. You may proceed.

MS. FONTENEAU: Thank you, Your Honor.

***

DIRECT EXAMINATION

BY MS. FONTENEAU:

Q. Can you state your name for the record?

A. Euell Wayne Harvell.

Q. Thank you, Mr. Harvell.

A. I go by "Wayne," if you don't mind.

Q. Can you tell me where you worked in 2016?

A. The SIS office at the Federal Bureau of Prisons in Talladega, Alabama.

Q. What does SIS stand for?

A. Special Investigative Services, ma'am.

Q. Okay. And when did you move into that role?

A. Full-time, 2006. A little background on that, I was placed in SIS in 2003 by Martha Jordan, Warden Jordan, to get ready for the program review that we had coming up. And I never lost my -- they didn't take my keys when I left out of there, so I just worked a year and a half in there and then went back as a correctional officer and then came back full-time as an SIS tech.

Q. And do you still do that now?

A. No, ma'am. I am retired.

Q. Okay. And when did you retire?

A. July the 31st of 2021.

Q. Now, can you tell me what you did as an SIS technician?

A. A lot of different things. We done, one, urinalysis

testing -- excuse me, pee-pee testing. We done drug testing, NIK test kits. We done interviews with inmates that newly come into the prison. We done exit interviews when they leave the prison. We done investigations; i.e., assaults, fights, introduction to drugs, other contraband, a variety of things. That was the main things that we done there, though.
Q. And as part of your -- did you have training as part of your job as an SIS tech?
A. Yes, ma'am.
Q. And what kind of training did you receive?
A. I went to Denver, Colorado, at the training center, and we received two weeks of what they call "SIS Technician Training School." It talks about -- most of that training was about investigations and stuff like that, and no drug testing at that time.
Q. Did it talk about preserving evidence?
A. Yes, ma'am.
Q. And when you collect evidence, what should you do to preserve it?
A. Chain of custody.
Q. And what does that mean?
A. That is just what it means. It's the chain of custody. You are using that as evidence. It is going to presumably go to court is what we use it for.
Q. And so do you -- that means you preserve the evidence;

is that right?
A. Yes, ma'am.
Q. And you would -- if you created or you collected evidence, you would maybe place it in a bag for safekeeping later?
A. Yes, ma'am.
Q. Okay. And in part of your job, did you ever have to collect evidence?
A. Yes, ma'am.
Q. Okay. And when you were working in November of 2016, did you collect evidence that had been seized from Mr. Jenkins?
A. I tested an unknown liquid that was confiscated from him. I do not recall if there was a chain of custody generated by the officer that found that on him.
Q. Okay. But you collected that piece from that officer; is that correct?
A. Yes, ma'am, to test.
Q. And you utilized that piece of paper for testing?
A. Yes, ma'am, that's correct.
Q. How large was that piece of paper?
A. I did not measure it or anything like that. I didn't even put it by the -- by a scale.
MS. FONTENEAU: Lacey, can you -- Joint Exhibit 21.
We would like to show you, the Court, Joint

Exhibit 21.

We have got to turn the projector on.

Oh, no.

THE COURT: Maybe it is this one up here?

MS. FONTENEAU: It's not going.

(Discussion off the record)

THE COURT: It doesn't bother me if it is like that as long as the witness can see it.

MS. FONTENEAU: Okay.

Q. (By Ms. Fonteneau) And so looking at Joint Exhibit 21, at the top of that white sheet of paper, is that the brown sheet of paper that you found?

A. Yes, ma'am, above the two test kits.

Q. Okay. And is that -- and when you have got that piece of paper, did you utilize that for the test?

A. Yes, ma'am.

Q. What color is that paper?

A. It is brown-soaked paper.

Q. Okay.

A. But I did not test the brown paper as what you are saying. I tested the unknown liquid substance that was on that paper.

Q. Right. Okay. And so -- just scroll down a little bit.

Now, there was more paper there that you could test, correct?

A. Yes, ma'am.
Q. Okay. And you cut off a size -- what size piece of that paper did you cut off?
A. A small size, ma'am.
Q. And is that -- that small piece of paper -- what you see in the lower, kind of, left corner of "A," the "A" test bag?
A. Like I told you during the deposition, I can't recall. I don't never cut paper a half a centimeter that size. I use a very small piece of paper. It could be that paper, or it could be the glass ampoule or plastic ampoules that we broke in there.
Q. So looking in the bottom right corner, do you see any paper anywhere else other than the brown -- the side -- excuse me, the lower --
A. No, ma'am.
Q. -- left corner?
A. No, ma'am, I do not.
Q. And did you watch the paper disintegrate?
A. I don't think the paper disintegrates, ma'am.
Q. Okay. So would it be fair to say that this is -- the bottom of the paper is -- no where -- it can't be anywhere else other than the lower left corner?
A. I can't say it is paper. I can't say it is not the plastic ampoule or the glass ampoules either.

Q. All right. Is there anywhere else in that bag that you see paper?
A. No, ma'am.
Q. Okay. And then there's another piece of paper in the "U," right? You didn't -- did you take the same sample -- a piece of the sample that was in "A" and put it in "U" or another piece of the paper?
A. I took another piece of paper, a piece from that paper, and placed it in there.
Q. Okay. So you were able to get another sample out of the same piece of paper, correct?
A. Yes, ma'am.
Q. Okay. Now, what percentage of your time would you say you spend testing narcotics or testing for drugs in general?
A. It's hard to say. At this particular time, there was a lot of testing done at the Bureau of Prisons, not just our Bureau of Prisons, but throughout the whole Bureau of Prisons because of the epidemic of the K2/Spice and other drugs that were coming in on paper and stuff that we test.
Q. Now, K2/Spice is not methamphetamine, is it?
A. No, ma'am. It is a liquid.
Q. Okay. And is it -- isn't it close to -- more close to weed than it is -- excuse me, marijuana -- as opposed to methamphetamine; is that right?
A. That's what the -- when they first came up with it back

in the '70s, it had a marijuana compound with it. And then as the time progressed, the marijuana left from the drug, and other drugs was used in its place. That's the reason it is more potent than what it was.

Q. And no where in this sample did you find any evidence of K2/Spice, did you?

A. No, ma'am.

Q. All right. Now, are there other types of drug tests that can be performed besides a presumptive test?

A. On what?

Q. On any drug substance that you --

A. Yes, ma'am. Just -- for instance, I will go back to the marijuana. If it's a green-leafy substance, there is no sense in me going straight to the Test Kit A. I can go straight to a Test Kit E which is straight for marijuana, and I will place a small amount of those leaves or seeds in that and seal it up and pop the ampoules and go from there.

Q. Right. But, Mr. Harvell, is there another way to test for the presence of a drug other than a NIK kit test?

A. There's lots of ways, but for the Bureau of Prisons, we only use the NIK test kit, period, for drugs --

Q. Okay.

A. -- unless it's a urinalysis test.

Q. So there are ways to do it, but you did not use those ways; is that right?

A. What, as urinalysis?
Q. No. Did you use -- did you have any ability or -- well, let me just go back for a little bit and talk to you about the training that you had on the NIK kits.
A. Yes, ma'am.
Q. When did you have that training?
A. Back in 2003 when I went into office. It was on a DVD marked NIK for the narcotic identification kit that they sent out to us, that the bureau only -- that's the only test kit that the bureau uses testing drugs, the NIK test kit.
Q. It's the only field test kit that you use, correct?
A. Yes. That is it. That's the only thing that the Bureau of Prisons/Department of Justice allow us to buy.
Q. As a field test kit?
A. Correct.
Q. Okay. But the Department of Justice has access to greater testing than that, correct?
A. I -- yes, ma'am, they do.
Q. Right. They can send -- they have access to the labs that could test for other substances, don't they?
A. Yes, they do.
Q. Okay. You just didn't test -- send those to that --
A. That's not part of our procedure.
Q. Right. But you could have done that, right?
A. Yes, ma'am, if they had directed me to, yes.

Q. Okay.
A. But we use what we have at our hand, like we always do.
Q. Okay. We would like to show you Joint Exhibit 16.
MS. FONTENEAU: Can you scroll down?
Q. Okay. Let's go back to the first -- okay.
Now, can you explain what a presumptive test is as opposed to an actual lab test?
A. Yeah. It is where we take what we presume to be a drug and we put it in that test kit. If it's an unknown drug to us, we put it in Test Kit A; and if we get the color change, we will go where the flowchart says to go, to that color change. And then we will test some more of it. And then it will pop positive for whatever drug it may be or presumed drug it may be.
Q. Now, I want you to look at the third paragraph down here. What do these instructions say is the result of you not following the protocols in the NIK test?
A. It is also important to understand that there are proper procedures involved in the actual use of test kits.
Q. And what is next?
A. Ma'am?
Q. What does it say after that?
A. I am going to say divide --
Q. Deviating.
A. -- deviating from these protocols will give an

exclusive [sic] answer or may put the officer or observers at risk.

Q. Okay. And is it fair to say it is inconclusive, an inconclusive answer?

THE COURT: Yes. This word is "inconclusive." In other words --

THE WITNESS: Oh, I'm sorry.

THE COURT: If you deviate from the protocols, you may not get a conclusive answer.

Okay. You can proceed.

MS. FONTENEAU: Okay. Keep going.

Q. (By Ms. Fonteneau) And so --

MS. FONTENEAU: Okay. There you go.

Q. Now, I am going to page 7, I believe, of that -- it's Bates 214, where we are.

So one of the things -- now, were you trained that more tests are better than less tests when you are using the NIK kit?

A. More tests, ma'am.

Q. Right. And so when you go through the NIK-kit process, you go from test to test to eliminate -- eliminate or find the presence of certain -- the presumptive presence of certain compounds; is that right?

A. Yes, ma'am.

Q. And if you don't find the compound that you -- one

compound, you can use the test to find other compounds, correct?
A. If the color changes direct you to go that way of the flowchart, yes.
MS. FONTENEAU: Okay. Now, can I go to Joint Exhibit 15?
Q. All right. Now, have you ever seen this --
A. Yes, ma'am.
Q. -- document before?
A. Yes, ma'am.
Q. And what is it?
A. It is a flowchart, an identification flowchart.
Q. And is this the chart that you can use to identify drugs using a NIK kit?
A. Yes, ma'am.
Q. Okay. And is this -- did you have a copy of this in front of you when you were doing the testing for the piece of paper that was taken from --
A. Yes, ma'am.
Q. -- Mr. Jenkins?
A. Yes, ma'am.
Q. Okay. Now, I want to point you from "A" over to where you would go for amphetamines, if you found -- how you would determine the presence of amphetamines.
A. You'd go from -- when you test the drugs, it goes from

orange. And if it goes from orange to brown as it indicated, you would go to Test Kit U.

Q. Now, can you look over to the side of the -- the left side of it and look at the second -- the second line coming off of "A" from the left?

A. Yes, ma'am.

Q. Now, green under that one --

A. It says "I."

Q. -- would be amphetamines, correct?

A. Yes, ma'am.

Q. Okay. And so in order -- if you have got amphetamine as a possible substance, would it go orange to brown under this chart?

A. Yes, ma'am.

Q. Okay. Where do you see it going to orange under the second one to the right where it says "I" and "W"?

A. AMT.

Q. So if you go from the one that starts with "A" and goes brown first, do you see that from the second from the left?

MS. FONTENEAU: Yeah, can you cull that out, or can you draw on it?

A. Can you repeat, ma'am?

Q. Here, I am going to draw it for you.

A. Okay.

Q. Do you see here (indicating)?

A. Yes, ma'am.
Q. All right. Do you see what color at the bottom is there for amphetamine?
MS. FONTENEAU: You may need to scroll down so he can see the codes.
Q. Do you see where it says "AMT"?
A. Yes, ma'am. I see that.
Q. Okay. Now, let's go back to the top here.
MS. FONTENEAU: You might have to -- there we go.
Q. All right. So you see "A" going down to a brown sample directly.
Did you have that when you saw the testing for Mr. Jenkins?
A. No, ma'am. I saw an orange first, and then it turned brown.
Q. And then after that, what color did it turn?
A. Like all test kits, probably black.
Q. Did you -- do you see anyone here where it says that all test kits turn black at the end? Is there anywhere in your instructions that say that?
A. No, ma'am.
Q. Okay. Now, can you go back?
THE COURT: Well, let me ask, then: Is that just from your experience? What makes you believe that the test papers turn black at the end?

THE WITNESS: What makes you believe that?

THE COURT: Right. You testified that it turns black. Let me read --

THE WITNESS: I believe all of them do, sir --

THE COURT: Okay.

THE WITNESS: -- when you get -- when I guess their chemical compound breaks down. If you just let it sit there and you are seeing the paper, it is turning black.

THE COURT: Is that generally what would happen when you did a test is the longer it sat in there, it just turned to black?

THE WITNESS: Yes, sir. The longer it sits in there, everything turns black. Marijuana is a purple, pinkish-purple. Eventually it will turn black the longer it sits in there.

The orange to brown, the longer it stays in there, it turns black. On any of those test kits, the longer -- whatever you put in there is going to turn black.

THE COURT: Okay. You can proceed.

Q. (By Ms. Fonteneau) Now, do you see anywhere in this documentation where it says: Don't worry about it if it turns black at the end?

A. No, ma'am.

MS. FONTENEAU: Okay. Now, can you go back to the photo? Thank you.

Q. All right. Now, looking at --

MS. FONTENEAU: Keep going.

Q. Looking at the right sample, the "U" sample, what color is the water turning -- or not water, whatever the chemical solution is in "U" turning?

A. It is turning black.

Q. No. The --

A. After it turned red --

Q. -- the liquid.

A. It is turning black, yes, ma'am.

Q. Not the piece of the material, the liquid.

A. It is red right there.

Q. Okay. Is the liquid in anyplace -- how long had that liquid been sitting there?

A. Not long. Less than a minute.

Q. Okay. And how long had the "A" sample been sitting there?

A. Just a little bit longer.

Q. Okay. Now, do you see any of the water turning black in the "U" sample?

MS. POSEY: Objection. This is -- sorry.

THE COURT: Go ahead. No, you can proceed with the objection.

MS. POSEY: Oh, sorry, Your Honor. It's just that she keeps saying "water." It is confusing.

MS. FONTENEAU: I agree. Yeah, the chemical solution.

THE COURT: The liquid -- solution. Just use "solution." That's fine.

Q. (By Ms. Fonteneau) Do you see any of the chemical solution turning black there?

A. No, ma'am, but I see in Test Kit A on that -- to me, the left-hand corner of it down there where you keep saying "the paper" -- and I am not saying that it is not -- it is turning a darker color.

Q. Okay. Now, is the liquid --

A. That is the liquid I'm talking about.

THE COURT: Hey, Mr. Harvell, before we go any further, you can actually touch your screen. Watch how I do it. If you just touch the screen, you can actually circle like that if you are trying to tell us where you are wanting us to look.

THE WITNESS: Okay.

A. In this corner right here at the bottom where you keep saying it is the paper -- and I don't know if it is or not. I am not arguing with it, but the liquid or the solution just to the left of that as I'm looking at it, it is turning a darker color than the orange or the brown. So who is not saying that it is not turning black?

Q. Okay. So you think that the liquid solution was

turning black around that area; is that correct?
A. Yes. After the -- yes. The longer it sits in there, they will turn that color.
Q. The liquid solution or just the piece of paper?
A. The liquid in there will all turn that color.
Q. Okay. Now, do you see any evidence that the liquid solution in "U" is turning black?
A. Not at this time. I see a black spot there that I am assuming is the paper (indicating). That's the size that I normally use in there. That's black. But the liquid, no, ma'am, I do not.
Q. And in fact, on this screen -- on the "A" document, there are some color indications for "A." The top one looks to be sort of a burgundy color. The one below that looks to be black, correct?
A. Yes, ma'am.
Q. Okay. And then it is orange to brown, correct?
A. Yes, ma'am.
Q. Okay. And where do you see brown in this solution?
A. All that -- that solution on that side is turning brown (indicating).
Q. You believe that's brown (indicating)?
A. Yes, ma'am.
Q. Okay. Now, where --
MS. FONTENEAU: Let's go back to the NIK drug --

there you go.

Q. Can you show me anyplace on this Identidrug kit or testing system chart where it directs you what to do if the solution goes from orange to brown to black?

A. No, ma'am.

Q. Is it on there in any place?

A. I do not see any of them on there that says anything dealing with anything turning black.

Q. Okay. And in fact, what you did -- but you did just testify that you saw the solution turning black a little bit above whatever was in the lower left corner?

A. Yes, ma'am.

MS. FONTENEAU: Okay. Now, can you scroll down another page from this one? Yeah.

Q. Now, I want to show you the part for liquid. Let's talk about the types of samples. There are powder samples, correct?

A. Yes, ma'am.

Q. And those -- that could be -- well, let's start from the top.

So there are tablets. Did you have a tablet in your possession when you went to go test Mr. Jenkins -- whatever was recovered from Mr. Jenkins?

A. No, ma'am. It was a soaked brown piece of paper.

Q. Did you have a capsule?

A. No, ma'am. I had a brown piece of paper --
Q. And did you have any powder?
A. -- soaked in some type of liquid substance.
Ma'am?
Q. Did you have a powder?
A. No, ma'am.
Q. Okay. Now, going up to the top here, you didn't have plant material either, did you?
A. No, ma'am.
Q. Okay. And you didn't have what you thought to be suspected brown or black tar heroin, did you?
A. No, ma'am.
Q. Okay. So what you had was a liquid sample; is that right?
A. Not in the way that we called -- what you are saying liquid; but yes, it was a piece of paper soaked in an unknown liquid substance.
Q. Right. And if you had something that was liquid -- came to you in a liquid form, you would place it on a piece of paper?
A. No, ma'am. I would -- well, it would -- it is a dipstick is what it is called, and it is paper form, yes.
Q. Okay. Well, let's just talk about what you are supposed to do with liquid samples, all right?
All right. So they are not designed -- can we all

agree that NIK tests are not designed to be used with liquid samples; is that right?
A. That is correct.
Q. And so that means that if you have a liquid sample, this is not the best method to test that sample.
Isn't that what they are saying?
A. They are saying you don't test liquid, yes, ma'am; you put it on a dipstick. Each -- when you open up a NIK test kit, it has ten different individual kits in that box. In the top of that box, it has dipsticks in that box.
Q. All right. And -- but you didn't have that scenario because what you got was already somewhat dry; is that right?
A. Correct.
Q. All right. And so what you are supposed to do -- well, the way to test would be to use a one-centimeter square piece of paper and dip that in the liquid if you had liquid test --
A. Correct.
Q. -- a liquid sample, correct?
A. That's correct.
Q. You didn't have that, correct?
A. That's correct. I had a piece of paper that was soaked with an unknown liquid substance.
Q. And then you had to -- if you were using that procedure, you would then remove that and allow it to air dry, correct?

A. Correct.
Q. And so then you would have a dry piece of paper soaked in a substance, correct?
A. Correct.
Q. Okay. Now -- and then you would put the dry paper -- so are we essentially saying that by having a piece of paper that already had the substance on it, that you kind of just skipped ahead in the procedure?
A. How did we skip ahead? It was -- what people failed to realize in the Bureau of Prisons at this time when we had this epidemic of drugs coming in, when we say "liquid," it is already on a piece of paper. It is not that you can squeeze it out of it or anything like that. It is dry.
Q. Correct. But what you --
A. So you cut it from there, and you test that.
Q. Right. And so, basically, in effect, you stepped ahead in the scenario. You didn't dry it yourself. You just used the dry paper so you would start -- instead of going through and using the test strip, you would just start with the "place the dry paper into the test pack" portion of these instructions, correct?
A. Correct.
Q. And that's essentially what you did, right?
A. Correct.
Q. Okay. So you had a piece of paper that had something

soaked in it and it was already dry, and so you placed it in the solution.
A. That is correct.
Q. Right. Okay. So -- but here, you had a piece of brown paper; isn't that right?
A. Yes, ma'am.
Q. Okay. But the instructions say that if you are testing a liquid, you have to use unscented, uncolored filter paper, and that is what is ideal, correct?
A. That's what it says.
Q. Okay. And then it says, Never use brown paper, hand towels, or newsprint. Isn't that right?
A. But I didn't test the brown paper. I tested the unknown liquid substance that someone placed on that that was found on his possession.
Q. Right. But it was on -- the method that you had to do it was a piece of brown paper, right? You didn't extract any liquid and put it into the solution. You put a piece of brown paper into the bag --
A. Correct?
Q. -- right?
And the instructions say, no matter how it comes to you, that you can't use the test with brown paper; isn't that right?
A. Per that piece -- per that instruction, yes, ma'am.

Q. And in your training, you understand that these tests are based on science, correct?
A. Yes, ma'am.
Q. Right? And they are based on chemical reactions, right?
A. Yes, ma'am.
Q. And those chemical reactions are reactions between the liquid that are used to -- the liquid that are used to cause those color reactions and the material that you placed inside the bags, correct?
A. Yes, ma'am.
Q. And can you tell me any way or anywhere that the substance of those reactions would change based on you not having it -- well, how is it that you can say, or if you can, that those chemical reactions can be changed because you didn't have -- let me see if there's a better way to ask this question.
Are you able to change the science of those chemical reactions based on what kind of sample you have in your possession?
A. I do not know. I --
Q. Right. Is there anything different about the chemistry that happens because of what you happened to have in your possession?
A. I do not know. I never took chemistry, and I don't

know nothing about it, ma'am.
Q. Right.
A. I just -- I done what we was instructed, you know, as -- the bureau used the NIK test kits to test that unknown liquid that was placed on that brown piece of paper.
Q. Now, these instructions with this Identidrug piece of paper, that's actually in the box that the drug testing kits come in, isn't it?
A. Yeah. That flowchart, yes, ma'am.
Q. And so you had it in your possession or could have had it in your possession to read at the time that you made these tests, that you took these tests, right?
A. I could say yes to that, yes.
Q. Okay. Now, when you got the -- when you got the test, did you read the part where it says, No chemical reagent system for field use exists that is capable of eliminating occasional invalid test results?
A. No, ma'am.
Q. Okay. And did you read the part where it said, A complete forensic laboratory would be required to qualitatively identify an unknown suspect substance?
A. No, ma'am.
Q. Okay. And did you consult the test to find out what you -- when you found what you thought was amphetamine, did you consult the test to figure out how to presumptively rule

in amphetamine as a substance that you are -- that you had in your possession?
A. I had amphetamines because that test kit said it was positive for amphetamines.
Q. Okay.
A. And that's what we went to.
Q. Did you look back at the Identidrug chart to determine how to make a test for -- how to test for amphetamines?
A. Yeah. I went -- it turned orange to brown, and then I went to "U" and it tested positive for that red color and it said "amphetamines."
MS. FONTENEAU: Okay. Can you scroll back up to the page above?
Q. Isn't it true that if it is amphetamine, you would have had a brown result from the beginning in the --
A. I am not a chemist. I don't know that. I went off the flowchart.
Q. Right.
A. It turned orange when I put it in there. It went from orange -- within 10 or 12 seconds, it turned brown. And from brown, I looked on the flowchart, and it said go to "U." I went to "U." It turned red, tested for amphetamines, and that's where I stopped at and I wrote the incident report, ma'am, after I took the pictures.
Q. Okay. But you do agree with me now that had the

test -- the "A" test, which is the one that is supposed to send you on the different paths in the flowchart, had the "A" test identified compounds similar to amphetamine, it would have turned brown immediately. There would not have been an orange test --

MS. POSEY: Objection. Speculative.

Q. -- or orange test result?

THE COURT: I am going to overrule. I mean, it is a bench trial, and I understand the point she's getting to.

Q. Do you see where that's going? Do you see where that goes on the -- on the test?

A. Yes. I see where you are saying, ma'am.

Q. Okay.

A. Yes, ma'am.

Q. Okay. And so is it possible that you misread the Identidrug chart?

A. Anything is possible, yes, ma'am.

THE COURT: Let me ask the parties a question.

Scroll down or make that full screen, this joint exhibit, because it looks a little different.

Okay. I am just making sure that what is on the screen is the same thing I've got because on mine, Exhibit 15 is in a different place, and I didn't see all the other stuff.

Okay. You can continue.

Q. (By Ms. Fonteneau) Now, you said you also have the

ability to do urinalysis testing as part of your job, correct?
A. Yes, ma'am.
Q. Now, did you -- did you test Mr. Jenkins as part of this investigation?
A. Not that I know of, no, ma'am. Because I find a piece of paper or a liquid on a piece of paper that's found on them, that's not protocol to give them a urinalysis right there because what says they have used it yet? So why waste money on a urinalysis test kit when you don't know if that drug is in him now? Three or four days later, I would probably test him, but I can't recall if I did or did not.
Q. Did Mr. Jenkins --
A. And the incident report would not reflect that.
Q. Did Mr. Jenkins ask you to test him?
A. Not that I recall.
Q. Okay. But if he had been using K2/Spice, amphetamines, or methamphetamine, you would have -- you would have been able to determine that with a test, correct?
A. With a urinalysis test?
Q. Yes.
A. Yes, ma'am.
Q. And that would have further supported your contention that Mr. Jenkins was in possession of amphetamines?
A. Yes, ma'am.
Q. But you didn't do that?

A. No, ma'am.
Q. Okay. Was there anyone else there with you when you did that test?
A. Not that I recall, ma'am.
Q. Now, hold on just one second. I may be almost done with you, so I want to make sure I am before I let you free.
Now, just making sure: Did you have any other evidence that Mr. Jenkins had been in possession of any elicit substance at the time that you made this report?
A. What do you mean?
Q. Did you have any other observational evidence that Mr. Jenkins had been in possession of amphetamines?
A. No, ma'am.
Q. And amphetamine is an upper, right? It's a -- it is a stimulant?
A. Yes, ma'am.
Q. And people on stimulants are hyper. They might be kind of fidgety, right?
A. Yes, ma'am. I'm not a druggist or anything like that.
Q. Did you see any of that on Mr. Jenkins?
A. I had 16 other inmates in there. I don't -- I don't recall Mr. Jenkins personally.
Q. And did you -- what did you do with the rest of the brown paper?
A. It was left in the evidence safe. I don't know where

it is at now or -- like I said, I retired in 2001, and 32 months at that time, all evidence, if it is not going on -- if it is not part of a case or criminal case, it is destroyed.
Q. After how long?
A. 32 months to -- I believe at that time it was 32 months. I think it is now 48 months, I think, is what they went to now.
Q. Okay. And so at the time that Mr. Jenkins -- so if Mr. Jenkins had filed internal administrative actions or legal actions, you would keep that evidence, correct? Isn't that what you just testified to, if it is not going on as part of a case?
A. It would -- no. It has to be a legal case directed by the Bureau of Prisons or the FBI or something like that. They would come and get that and -- they would keep the evidence. They would come sign for it and keep it, the FBI would. The Bureau of Prisons would -- to the best of my ability, nothing that I have done has ever been in to court. So it would stay with me until that time frame's up. And if we check and they say no case against them, it would be disposed of, destroyed.
Q. After 32 months?
A. 32 or 48 months.
Q. Right. And so -- but if there was some kind of case that went forward, it would still be kept?
A. Yes, ma'am.

Q. Right. And so presumptively, then, at the -- that brown piece of paper would have been available to the Bureau of Prisons or anybody in 2018 or perhaps 2019 for them to retest it conclusively, right?

A. Yes, ma'am.

MS. FONTENEAU: Okay. I think I am done with this witness.

THE COURT: Okay.

All right. I have got some questions for you before the government goes, but I need the government to help me for a second.

Can you pull up Exhibit 21?

Let's switch it over to the government's computer because it's going to -- full screen is going to be necessary for what I need to talk about.

MS. POSEY: Okay.

THE COURT: And just for the record, I am doing this before the government to give the government the opportunity to clear up anything that I am about to bring up.

MS. POSEY: Your Honor, is it all right if we use the hard copies rather than the screen? Well, I can work on --

THE COURT: I mean, if we need to, we can go back to them. I think it's going to be easier for everybody if we use the screen because I am going to need to circle, and everybody

is going to need to see what I am talking about.

MS. POSEY: Okay. Yes, Your Honor. Hold up one second.

THE COURT: And if we need to go back to Plaintiff's table, that's fine.

(Brief pause)

THE COURT: Mr. Hood, is it you or Ms. Posey that's going to ask the questions?

MR. HOOD: Ms. Posey.

MS. POSEY: Me, Your Honor.

THE COURT: Okay.

Sorry. I don't have them on my computer or I would do it. I normally do, as most of you know.

MS. FONTENEAU: We have a jump drive.

THE COURT: A flash drive?

MS. FONTENEAU: Yes. Would you like it?

MS. POSEY: I have it right now, Your Honor.

THE COURT: I can do it during the lunch break.

MS. POSEY: Which exhibit, Your Honor?

THE COURT: 21 is where I want to start. I am going to do 21 and 15.

All right. That's fine if you just leave it right there.

***

EXAMINATION

BY THE COURT:

Q. All right. Mr. Harvell, so it is really a two-part question. And you see here on the description where it says the brown paper tested positive for amphetamine. I read that correct, didn't I?

A. Yes, sir.

Q. So your -- at the time that you created this report, you believed that the red liquid in Test U showed a positive for amphetamine, not methamphetamine, correct?

A. Correct. Amphetamines.

Q. And that's what you turned in. You didn't go and do any further test after test, did you?

A. No, sir.

Q. Because you believed that the red was a positive test?

A. Correct, yes.

Q. All right. Let's go to 15. And I understand where Ms. Fonteneau is going, but I would get there a different way, because this is what concerned me when I looked at it.

All right. If you can, blow up this section that shows us the "U." I am going to clear that, but show us the "U."

All right. Right there.

So you used -- the second test was this "U" test, correct?

A. Yes, sir.

Q. And your analysis was, because it turned red, that was a positive test for amphetamine?
A. Yes, sir.
Q. All right. If you look, though, on the chart, it has amphetamine with a sub 2 next to it. Do you see that, the little 2?
A. Yes, sir.
Q. It's a footnote.
THE COURT: Blow up the footnote.
Q. The footnote says only after Test A goes from orange to brown, which is why you go to Test U, correct?
A. Yes, sir.
Q. And Test U turns: Can you presumptively identify the substance of an amphetamine-type compound?
Red in Test U alone does not -- and "not" in all caps -- indicate amphetamine-type compounds.
Did I read that correctly?
A. Yes, sir.
Q. So the chart that you are using expressly says that a red Test U does not indicate amphetamines, correct?
A. Yes, sir.
Q. So why did you find that red did indicate amphetamines when the chart itself says that it doesn't?
A. Because I didn't see the 2. I have never --
Q. You have never seen the footnote.

A. Yes, sir.
Q. Which I believe then leads to what Ms. Fonteneau's point was: If you see red -- the point of the red is, is it is not blue. You haven't found methamphetamine. You have found something else.
A. Correct.
Q. So the point of the footnote is: Because it is red, you don't know that it is amphetamine. The only way -- now blow it back out.
The only way to determine whether it is actually amphetamine is to then do the "I" test that Ms. Fonteneau keeps pointing out, that you put it in the "I" test and it should -- not "I," but you would go to "W" and see if it is green.
Would you agree that that --
A. Yes, sir.
Q. -- is the only way to positively determine amphetamines?
A. Yes, sir.
THE COURT: All right. Mr. Hood, if you want to take any time on a break to think about -- or Ms. Posey -- to think about that because I know it is not something that y'all have brought up before, but we can either go forward now, or if you want to take five or ten minutes because I know I am bringing up something different.

But that's where -- that's Ms. Fonteneau's point, but, I mean, the footnote seems to clearly indicate that red can't be a positive for amphetamines.

MS. POSEY: Yes.

MR. HOOD: Go ahead.

MS. POSEY: We are happy to take a break now or go forward now.

THE COURT: Let's take ten minutes.

MS. POSEY: Okay.

THE COURT: And, sir, if you want to go use the restroom or do anything, you don't have to sit there for ten minutes. That's fine. The restrooms are on this hall (indicating).

We will be back at -- it is 10:19. Let's be back at 10:30.

THE WITNESS: Yes, sir.

THE COURT: Thank you.

(Recess taken from 10:19 a.m. to 10:32 a.m.)

THE COURT: Y'all can remain seated.

All right. Before we get started back, shrink that a little bit.

(Discussion off the record)

THE COURT: All right. One other question I had -- and this is maybe even for the attorneys in addition to Mr. Harvell.

Ms. Fonteneau's questions have indicated or assumed that the amphetamine test is the "I" to "W" test, but if you look over here (indicating), "U" clearly tests for methamphetamine versus amphetamine.

The "W" test just says "AMT." It doesn't say "amphetamine."

And our question was: Is AMT not a different substance altogether? I thought that AMT in the feds was a completely different thing than amphetamines. In fact, if I do a search for it, alpha-methyl- -- let me spell it for Ms. Carrie. Alpha-m-e-t-h-y-l-t-r-y-p-t-a-m-i-n-e.

MS. FONTENEAU: Can you do that one more time, Your Honor, please?

THE COURT: Yes. Alpha- -- m-e-t-h-y-l-t-r-y-p-t-a-m-i-n-e -- methyltryptamine.

MS. FONTENEAU: It does look like it may be different, Your Honor.

THE COURT: I think it is different, so I don't even think that the "I" to "W" test would even be relevant here. I think the "U" test is the correct test after orange to brown. It just -- the "U" test -- and, again, this is just me, somebody looking at the chart -- it seems that the "U" test is used to determine whether an amphetamine substance is methamphetamine or not. If it turns blue, yes.

According to the footnote, if it turns red instead,

then it could be amphetamines but more testing is needed because it's -- the red alone is not a positive, according to Footnote 2. That's how I read the chart.

But it says, Only after Test A goes from orange to brown and Test U turns can you presumptively identify the substance of an amphetamine-type compound. Red in Test U alone does not -- again, with "not" being capitalized -- indicate amphetamine-type compounds.

So if you get blue, then you know it is meth. If you get red, then you need something else to determine whether it is an amphetamine-type compound.

That's the way I read the chart.

So now that y'all understand where I, as the fact-finder, sort of reads this, Ms. Posey, the witness is yours.

MS. POSEY: Thank you, Your Honor.

Permission to ask the witness questions from here.

THE COURT: Oh, yeah, you are fine sitting there.

MS. POSEY: Okay.

THE COURT: Both sides can sit at their tables, as long as you talk into the microphone. I know it is much easier to control the exhibits that way.

MS. POSEY: Thank you, Your Honor.

***

CROSS-EXAMINATION

BY MS. POSEY:

Q. Mr. Harvell, I want to go back to the issue that Judge Maze just raised. And on Footnote 2, it says, Only after Test A goes from orange to brown and -- all caps -- Test U turns can you presumptively identify the substance of an amphetamine-type compound.

Red in Test U alone does not indicate amphetamine-type compounds.

Did I read that correctly?

A. Yes, ma'am.

Q. So you can't do just Test U by itself and say that it is -- that amphetamine or methamphetamine is present; is that correct?

A. According to the Footnote 2, that is correct.

Q. Okay. So you have to use Test U in conjunction with Test A?

A. Correct.

Q. Okay. And going over to page 2, it actually -- under "Introduction to the NIK Polytesting System," it actually says -- or it says, Always begin polytesting with Test A and continue from test to test until a positive or negative result is obtained.

And it says Test E, L, M, N, P, Q, and R are exceptions to this rule and are designed as standalone tests.

So Test U is not listed in that -- or sorry. Did I read that correctly?

A. You are correct.

Q. And Test U is not listed in one of the standalone tests; is that correct?

A. That is correct.

Q. So you are supposed to start with Test A?

A. Correct.

Q. Okay. And then it gives an example, and the example says, Beginning with Test A, a suspect material sequences from orange to brown within 10 to 12 seconds. Following the polytesting chart, Test U comes next in sequence.

A blue result in Test U confirms the presence of methamphetamine. A reddish-pink or negative result in Test U indicates an amphetamine-type compound.

Only by following the proper sequence of tests from A to U is a positive result obtained.

Did I read that correctly?

A. Yes, ma'am, you did.

Q. Okay. And is that what you did here?

A. Yes, ma'am.

THE COURT: Can you go back to the footnote?

MS. POSEY: Yes, Your Honor.

THE COURT: So your position is that second sentence is only saying that if you start with U and get red, that

doesn't prove it is amphetamine. You have to start with A and get orange to brown. But once you do that, then the second sentence goes away, that red actually does prove amphetamine other than meth.

MS. POSEY: Not exactly, Your Honor.

THE COURT: Okay.

MS. POSEY: Our position is that you start with Test A. It goes orange to brown. That indicates the presence of an amphetamine-type compound.

THE COURT: Okay.

MS. POSEY: Test U eliminates that it is methamphetamine. So Test A confirms that there is some sort of amphetamine-type compound there.

THE COURT: Uh-huh.

MS. POSEY: And Test U is simply narrowing it down and eliminates that it is not methamphetamine.

THE COURT: So then what does the second sentence mean?

MS. POSEY: Red test -- red in Test U alone does not indicate amphetamine-type compounds.

So if you were to do just Test U and it turns red, that doesn't prove that it's amphetamine. You have to do it in conjunction with Test A first.

THE COURT: That's what I said. Your position is the second sentence is just warning you: Don't only do

Test U. In other words, don't start with "U."

MS. POSEY: Yes, Your Honor.

THE COURT: If you start with "U" and get red, that doesn't prove amphetamines.

MS. POSEY: Yes, Your Honor.

THE COURT: But if you start with "A" and get orange to brown, then "U" turns red, that does prove amphetamines.

MS. POSEY: Yes, Your Honor.

THE COURT: And you would say that that is proved by the second page, if you want to go back to the back of it, where it says a reddish pink or negative result in Test U indicates an amphetamine -- if you begin with "A," it will go orange to brown within 10 to 12 seconds. And then you go to "U," blue confirms -- and uses the word "confirms" -- meth.

Reddish pink or negative indicates amphetamine. But notice the difference in words. Test U, blue confirms; red indicates.

So it intentionally chooses to say one is a confirmation and the other is an indicator.

So go back to the footnote.

Red in Test U alone does not indicate. That is -- I mean, it's literally contradictory. Does anybody in the room -- can anybody explain how those are not contradictory sentences?

MS. FONTENEAU: No, Your Honor.

MS. POSEY: No, Your Honor.

MS. FONTENEAU: I will say that the "W" test is -- this is not something that is in the record.

THE COURT: Right.

MS. FONTENEAU: But Google says that the NIK W test is actually for amphetamine and methadone, will test that.

THE COURT: Okay.

MS. FONTENEAU: But, I mean, that is not in the record.

THE COURT: Yeah, it is not in the record. I was just asking the question.

MS. FONTENEAU: But yes.

THE COURT: But the difference between Footnote 2 and the back of the page, I mean, they seem to say the exact opposite things. Does anybody disagree with that?

MS. FONTENEAU: No.

MS. POSEY: No, Your Honor.

THE COURT: Okay. You can continue.

That would be frustrating in your position, I assume.

THE WITNESS: Yes, sir. Always.

THE COURT: Okay. Go ahead.

Q. (By Ms. Posey) Mr. Harvell, where did the NIK tests and NIK test instructions come from?

A. Where did they come from?

Q. Yes.
A. From that company, NIK test kit, narcotic identification kit company.
Q. So these instructions are not written by the BOP?
A. No, ma'am.
Q. Okay.
A. They are written by that company.
Q. Okay.
A. That's been -- they are the largest and most well-known drug test kit to this day. That's the reason the BOP only uses them.
Q. And going back to the flowchart, once you get to the end of one of these chains, are there any instructions on this flowchart that say, Go back and redo Test A?
A. No, ma'am.
Q. When you do one of these NIK tests, do you make a record?
A. As far as what, ma'am.
Q. How do you document the results?
A. Just like we done, the bureau had us take a picture of those test kits and place them with a memorandum or that incident report that we done.
Q. Okay. So you do the photo sheet?
A. Yes, ma'am.
Q. And then you fill out an incident report?

A. Yes, ma'am.
Q. And on the incident report, you say, I tested the brown paper first using the NIK Field Test Kit A. I observed an initial color of orange which changed to the color brown. Following the Identidrug Flowchart, I proceeded to Test Kit U.
Test Kit U yielded a reddish-purple color indicating a positive result for amphetamine; is that correct?
A. Yes, ma'am.
Q. And just to clarify: What was the sample that you were testing in this case?
A. An unknown liquid substance that was on a brown piece of paper found on Mr. Jenkins' possession.
Q. And you didn't -- could you get any sort of that liquid substance off the brown piece of paper?
A. No, ma'am.
Q. Is there anything in these instructions that say what to do when your sample is already on a piece of brown paper?
A. No, ma'am.
Q. And you didn't choose to put the unknown substance onto a piece of brown paper, did you?
A. No, ma'am.
Q. Okay. Mr. Harvell, how many times have you done a NIK test?
A. A lot. Over a hundred. I would -- I would -- to put a number on it, I can't say, but it is probably close to

thousands in this. During this time, there was an epidemic going on at the prison, and that's what we done most of our time, running to body alarms, getting people off to the hospital, and then testing.

Q. So can you please describe the types of drug problems FCI Talladega was dealing with in November of 2016?

A. When we first found out about it, it was inmates falling out. I hate to use this term, but they were falling on the ground flopping like fish out of water from smoking paper with that unknown liquid substance on it. Some of it was K2/Spice. Early on when we tested it, it did test positive for marijuana. That's how we knew it was the liquid stuff. And then after that, it quit testing for marijuana because they had used different ingredients or different drugs. And then we just -- every time we would get a sheet of paper, test, test, test. We had 14 inmates fall out in one day going to the hospital for an unknown substance like this. And that's the reason it was test everything.

THE COURT: Now could it be different types of paper, sometimes it might be notebook paper, brown paper --

THE WITNESS: Yes, sir. It could be brown paper, white paper. They would -- inmates would have somebody on the street, sometimes family members, sometimes not. You could hear it on some phone calls. They would just say, Go get the stuff off the internet, soak this paper in it. Let it dry.

Color on it, like a kids coloring. Just scribble on it. Send it in like it is a kid's drawing, and I can make money and I will pay you off later. That's pretty much the conversations on some of these guys that was doing this.

I'm not saying Mr. Jenkins because I never heard his voice or anything like that. I am just saying other inmates.

But the drugs was coming in on paper because we hear it on phone calls, and it was: Test everything. There was no guidance on anything like that. It was just: Test it and find out. Test it and find out.

THE COURT: And I am assuming that's why these were random searches.

THE WITNESS: Yes, sir.

THE COURT: Okay.

THE WITNESS: Generally, during the day -- it is different at every prison, but at FCI Talladega, it was nothing uncommon to do between 5 to 45 for one person random pat searches at this time. I'm not saying that they was on drugs. We were just trying to find drugs or anything. We didn't see -- some people you can see that was walking around impaired to some point. Some of them, the normal -- with officers saying normal, that they worked with them all the time, didn't act this way and now they are acting a different way -- they would pat them down or they would -- if they was acting irrational or irregular, they would call us and say,

Hey, I couldn't find nothing on them. Can you put them on a suspect list on the urinalysis test? And once they called and gave me a memorandum, we put them on a UA drug test kit which is a 90-day thing. Every month for 90 days, I would give them a UA test for a suspect. I suspect they were on some type of drug.

THE COURT: Okay.

THE WITNESS: And that's how we would go with that. But as far as just walking up to people and saying, Hey, I need that brown paper or this paper that you got, nobody knew. It was just people falling out and acting weird, and they just -- the bureau said, Go put your hands on people and pat them down and see what they have got. Anything that you get that is on paper, you bring it to SIS and we will test it. And that's what we done.

THE COURT: All right. You can continue.

MS. POSEY: Thank you, Your Honor.

Q. (By Ms. Posey) Mr. Harvell, just to clarify: Did you do the pat search of Mr. Jenkins?

A. No, ma'am.

Q. You just tested what was brought to you?

A. Yes, ma'am.

Q. I'm sorry. I am jumping around. Going back to your incident report, it looks like the pat search was done around -- a little bit after 6:00 p.m. in the evening; is that

correct?
A. Yes, ma'am.
Q. And then on your photo sheet, it is time-stamped down at the bottom --
A. Yes, ma'am.
Q. -- is that right?
A. It's at 6:22. That's both tests completed and done. That's how fast it was.
Q. So you saw the color change orange to brown within the first 10 to 12 seconds?
A. Yes, ma'am.
Q. And 15, 20 minutes later, then you take the picture of --
A. With both of them done.
Q. Okay.
A. With all my testing done, yes, ma'am, I took the pictures and made that spreadsheet right there, and then I typed up my incident report.
Q. Okay. Ms. Fonteneau asked you about the training course that you do with the NIK system. Do you remember her asking you questions about that?
A. Yes, ma'am.
Q. I want to look at -- well, first of all, did FCI Talladega have a lab where you could do secondary testing --
A. No, ma'am.

Q. -- at the facility?
A. No, ma'am.
Q. Okay.
A. To my knowledge, no Bureau of Prison has a lab that tests on their possession or on their spot.
Q. So the only test that you had available to test samples confiscated from inmates was the NIK test?
A. Yes, ma'am. That is correct.
Q. So I want to look at this page of the instructions, and it says, Test results for correctional institutions. And it says, In some jurisdictions, NIK results are considered proof positive but only in a correctional setting. NIK polytesting is extremely accurate. Positive results are used for administrative punishments. Small, confiscated qualities preclude return-to-court system for punishment. Additional laboratory work would bog down an already overburdened system. And in states like New York, correctional institutions do not send the suspect material to a lab for confirmation.
Did I read that correctly?
A. That is correct.
Q. And just to clarify: Administrative punishments, do you understand that to be, like, a disciplinary hearing as in this case?
A. That is what it is, yes, ma'am.
Q. Okay.

THE COURT: Was it common to only use the results of a NIK test for administrative proceedings?

THE WITNESS: Yes, sir. Yes, sir. Very common.

THE COURT: Okay.

Q. (By Ms. Posey) Mr. Harvell, when you were talking about the epidemic of the K2/Spice and the inmates who were sent to the hospital, do you remember when that occurred?

A. Just a few months before Mr. Jenkins was found with the paper.

Q. Okay.

A. I can't put an exact time on it. It was just a few months before that. We had people just falling out left and right.

Q. Did you have any tests available in November 2016 that was specific for testing paper that was soaked in something?

A. No, ma'am.

Q. And the sample from Mr. Jenkins was not a liquid, was it?

MS. FONTENEAU: Objection, Your Honor.

THE COURT: Basis?

MS. FONTENEAU: Well, Number 1, the testimony on direct was that it was a liquid that was -- so she's trying to elicit him to change his testimony in a way that I think is improper.

THE COURT: Well, let me just ask him directly:

Tell me if I'm correct or incorrect. My understanding is this is a piece of paper that was suspected to have been dipped or soaked with some sort of substance.

THE WITNESS: That is correct, yes, sir.

THE COURT: So it is not like the paper felt wet when you got it. The question was: Had it been soaked in something that could be smoked?

THE WITNESS: Correct, correct.

THE COURT: Were you -- I know that you were looking for K2/Spice particularly, but were you finding other substances on paper too?

THE WITNESS: Yeah. We -- there were several amphetamines that we done. We had some methamphetamines that tested positive off of the paper. My recall, I am -- it has been a while. I know methamphetamines and the K2/Spice, and I know we have more amphetamines. I want to say one or two of them, something like that, might have tested positive for cocaine, but it was mostly methamphetamines and K2/Spice. And then a bunch -- not more but a little bit less than methamphetamines on the amphetamines part of it.

THE COURT: If you remember -- and I understand how long ago it has been, but if you remember, was that paper wet enough that you could have taken the dipstick?

THE WITNESS: No, sir, it was not.

THE COURT: So it was dry to the point that that was

the only way you could test it?

THE WITNESS: Yes, sir.

THE COURT: Okay. All right.

THE WITNESS: Yeah, we never, never -- if it was wet to the touch, never -- we just let it sit there until we could cut it off and test it like that.

THE COURT: Okay. So the objection is, essentially, sustained in that he's clarified it wasn't liquid. It was just a paper that might have been soaked with something.

All right. You can continue.

Q. (By Ms. Posey) What sort of drugs were you testing for that were in liquid form at that time?

A. Ma'am?

Q. Were there any drugs that were liquids that you tested in that time?

A. No, ma'am. I didn't -- as a liquid drug?

Q. Or -- is alcohol permitted in Bureau of Prisons?

A. No, ma'am. It is a different test for alcohol.

Q. Okay. Do you know of BOP policies and procedures that require drug testing of inmates?

A. As urinalysis testing? Yes, that is required every month for inmates. Urinalysis.

Do you want a breakdown on it or just --

Q. Whatever your knowledge is, Mr. Harvell.

A. We done -- every month at the first of each month, we

run a -- several rosters that do urinalysis test results. One of them is a random result -- list that the computer just generates.

The next one will be a prior-use test. That means they have popped positive prior to this; and now, once they hit that list there, they get a urinalysis test every month for 24 months. If they stay clean, don't pop positive, they come off the list.

Then you have a saturation test is where we pick up a work detail, any work detail, and then we print up everybody on that work detail. And they will get a urinalysis test. And then you have your suspect list, 90-day suspect, where a staff member will call you, and they have to do a memorandum. We make them do a memorandum, irrational behavior or whatever, or -- then they would give it to us, and then we would do 90 days where -- every month for 90 days, they will get a urinalysis test. And if they don't pop positive, they just fall off the test, nothing happens, and move on.

And there is one other one. I forgot. I am trying to remember. It is a community -- community is -- it is usually done at our camp. It is where they go out and work in the community, Anniston Army Depot. They -- about 11 or 15 inmates, they will get -- it says 50 percent of those, but every time they go out, we do a hundred percent every month of those guys that's out in the community, that goes out in the

community for a urinalysis test every month. We do a hundred percent of those.

THE COURT: Okay.

THE WITNESS: And I think, if I am not mistaken, that is all the urinalysis tests that we do.

THE COURT: Okay.

Q. (By Ms. Posey) Mr. Harvell, were you at the disciplinary hearing for Mr. Jenkins?

A. No, ma'am.

Q. Okay. Well, do you know who the decision-maker is at a disciplinary hearing?

A. The DHO would be -- if I am not mistaken, the disciplinary hearing officer, they are the ones who conducts the hearing and does the sanctions on those. They, as administrative punishment, take their good time, so many times -- so many days in the special housing unit for whatever infraction they done. It could be a loss of visit. It could be a loss of phone calls. It could be a combination of those that -- sometimes they can take their commissary for a certain amount of time. It's just whatever their guidelines allow them to do.

Q. And a disciplinary hearing officer is not a court judge, are they?

A. No, ma'am.

Q. Mr. Harvell, did you harbor any malice towards

Mr. Jenkins?
A. No, ma'am.
MS. POSEY: Nothing further, Your Honor.
THE COURT: All right. Ms. Fonteneau.
MS. FONTENEAU: Just a couple of things.
Can we pull up Exhibit 16? And go to page 6.

REDIRECT EXAMINATION

BY MS. FONTENEAU:
Q. Now, I am showing you Exhibit 16, and it talks about the polytesting system.
Can you see at the bottom of that page what it says in terms of how many tests -- is one test better than three tests?
Do you see where it says that?
A. Where it says "in other words"?
Q. Yeah. In other words, two tests are better than one, three tests are better than two.
Do you agree with that?
A. Yes, ma'am.
Q. And do you also agree that the probability of a presumptive identification is greatly increased with greater number of tests used in the sequence?
A. Yes, ma'am.
MS. FONTENEAU: Now, go to page Bates 216.
Q. Do you see where -- the tests are a series of one-way

streets. Does that make sense to you?
A. Yeah, the arrows, yes, ma'am.
Q. Right. And so the -- and on the test for you, would you agree that it is a test for methamphetamine?
A. Yes, ma'am.
Q. And would you also agree that amphetamine is a different drug than methamphetamine?
A. Yes, ma'am.
Q. And they have different chemical compounds?
A. Yes, ma'am.
Q. Okay. Just one second.
All right. Do you see on the bottom of page 62, so that's Bates 269, what test is used for amphetamines?
A. "A."
Q. And then what? That's amphetamine-type compounds; isn't that right?
A. Yes, ma'am.
Q. Okay. And then after "A," what test is used just for amphetamines?
A. "W."
Q. Okay. Did you ever test -- use Test W?
A. No, ma'am.
Q. Okay.
THE COURT: Where is this from again?
MS. FONTENEAU: This is Exhibit 16, Your Honor.

THE COURT: Okay.

MS. FONTENEAU: These are the instructions, the training instructions.

THE COURT: Page what, though?

MS. FONTENEAU: Bates 269.

THE COURT: 269, okay.

All right. That's page 62 of the exhibit.

MS. FONTENEAU: Yes.

THE COURT: Okay. Go ahead.

MS. FONTENEAU: Okay. Now -- scroll down.

Q. (By Ms. Fonteneau) Do you see on these instructions, review testing liquids -- so in your instructions, you were told never to drop liquids directly into the solutions, right?

A. Yes, ma'am.

Q. Okay. And you didn't do that --

A. Correct.

Q. -- you didn't drop any liquids directly in there.

A. That is correct.

Q. In fact, what you were doing, if you had something that was a liquid, you were to put it on paper, correct?

A. Or -- yes. Yes, ma'am.

Q. Or the strip.

A. Yes, ma'am.

Q. If you had enough for the strip.

A. Yes, ma'am.

Q. And then you would dry it, correct?
A. Yes, ma'am.
Q. And so whatever paper that you used, no matter whether or not it came to you in liquid form or it was something that came to you that was dry on paper, you would put that piece of paper in the solution, correct?
A. Correct.
Q. But you were never to use brown paper in the solution, correct?
A. Yes, ma'am. You are correct. Per the test kit.
Q. And so it does not matter whether or not you had a -- would it matter at all whether or not you had other paper available to you in determining whether you had followed the procedure?
A. Other paper?
Q. Yes.
A. As in a different color? You are correct.
Q. Right. And does it matter what the Bureau of Prisons' policy is or what is available to you as to whether the test will be effective?
Does the Bureau of Prisons' policy and procedure have any effect on the chemical compounds that are in the solution?
A. No, ma'am.
Q. Okay. So if the solution will react negatively to brown paper, that is just how it is, isn't it?

A. Yes, ma'am.
Q. Okay. And so this is not -- and that means that this is not a proper test to be used for brown-paper-soaked substances?
A. But I didn't -- I didn't test the brown paper. I tested the unknown liquid that was soaked on that brown paper.
Q. You put brown paper in the solution, correct?
A. Correct.
Q. And then you read a result from that brown paper, correct?
A. That is correct.
Q. And so you did not somehow extract the liquid from the brown paper. You put brown paper in the solution.
A. Correct.
Q. Okay. So when you say you didn't test the brown paper, you tested brown paper, didn't you?
A. (Witness nods head.)
MS. POSEY: Asked and answered. Objection, Your Honor.
THE COURT: Overruled.
A. Yes, ma'am.
Q. Okay. And you don't -- you didn't do anything to change the chemistry of what was inside the liquid that you placed the paper in --
A. No, ma'am.

Q. -- did you?
A. No, ma'am.
Q. Okay. Oh, and when you -- going back to Exhibit 21, okay, the time of the photograph was 6:22, correct?
A. Yes, ma'am.
Q. Okay. And the -- and you took that immediately after you took the test?
A. Yes, ma'am.
Q. Okay. And this is -- and this picture is exactly what the paper looked like or, excuse me, what the --
A. Yes, ma'am.
Q. -- the test -- exactly at that time?
A. Yes, ma'am.
Q. No waiting, right?
A. No, ma'am. No, ma'am.
Q. Okay. And at that time, the paper was giving off black.
A. Orange to brown.
Q. And then black, right?
A. Yes, ma'am.
Q. Right?
A. Yes, ma'am.
Q. So it immediately turned black?
A. I don't know if it turned immediately black. It has been 10 to 12 seconds to get the orange color, so while it was

sitting there and I was testing "U," I am assuming it -- because you see the black. I am not going to dispute that. It is there. Somewhere in that time frame, it turned black.

Q. Okay. And so but within seconds or minutes, it turned black?

A. I can't say. I didn't put a -- I didn't watch it, ma'am. I saw the orange to brown, and then I looked at the flowchart. And I immediately grabbed "U" because it directed me to go there, and I tested "U."

MS. FONTENEAU: Okay. That's all I have.

THE WITNESS: Yes, ma'am.

THE COURT: Anything else?

MS. POSEY: No, Your Honor.

THE COURT: Just real quick before I let you go.

FURTHER EXAMINATION

BY THE COURT:

Q. Could you tell what kind of paper it was? Like, was it a brown paper sack, a paper towel?

A. No.

Q. Just all you knew is it was brown paper?

A. I don't know if it was -- I don't believe it was a brown paper towel that the bureau has.

Q. Okay.

A. It was a little rough. Do you know what I am talking about, sir? I can't explain it. It wasn't a paper towel.

Q. But you don't know exactly what it originally was.
A. No, sir.
Q. It was just some torn piece of brown paper?
A. Yes, sir.
Q. When you went through testing -- I mean, clearly this instance is different than what that -- the slide that was on the screen is talking about taking a liquid and dropping it on paper, and it tells you not to use brown paper, correct?
A. Correct.
Q. When you went through training that taught you not to put it on brown paper, did they ever discuss what to do if you are given a brown piece of paper?
A. No, sir.
Q. Because my assumption is: All you had was the brown paper, correct?
A. That is correct.
Q. And there was no way for you to extract whatever the substance was from the brown paper and put it on white paper?
A. No, sir.
Q. So you tested what you had?
A. Yes, sir.
Q. Did they ever talk about that instance when you got your training, what to do if it is a piece of brown paper --
A. No, sir.
Q. -- that is soaked?

A. No, sir.
Q. So this was, in your opinion at least, the best you could do in that situation?
A. Yes, sir.
THE COURT: Okay. Any follow-up from anybody?
Yes, Ms. Fonteneau.

FURTHER REDIRECT EXAMINATION

BY MS. FONTENEAU:
Q. And the "it was the best that you could do," it did tell you -- the instructions were explicit, right, not to do brown paper, though, correct?
A. Yes, ma'am.
Q. Okay. And so regardless of what the Bureau of Prisons said, you knew that the test kit itself was telling you not to use the brown paper, right?
A. Yes, ma'am.
Q. And the Bureau of Prisons instructed you to follow the test kit instructions, didn't it?
A. Yes, ma'am.
Q. And so if you were following the test kit instructions, you were doing what the Bureau of Prisons would have taught you to do, right?
A. Correct.
Q. And that would be not to use brown paper?
A. Correct.

MS. FONTENEAU: That's it.

THE COURT: Anything else?

MS. POSEY: Yes.

THE COURT: Okay.

FURTHER RECROSS-EXAMINATION

BY MS. POSEY:

Q. The instructions are not from the Bureau of Prisons, are they?

A. No, they are not.

Q. They are from an outside company.

A. They are from the NIK test kit company.

Q. And you had -- apart from the NIK test kit, did you have any other way to test this piece of brown paper from Mr. Jenkins?

A. No, ma'am.

Q. Are the -- the NIK test kit instructions are not BOP procedures, are they?

A. No, ma'am.

MS. POSEY: That's it, Your Honor.

THE COURT: Ms. Fonteneau.

FURTHER REDIRECT EXAMINATION

BY MS. FONTENEAU:

Q. The BOP procedure is to follow the test kit instructions, isn't it?

A. That's the way we were trained, yes, ma'am.

Q. Okay. And so whatever the instructions say, that it is what you are supposed to do, right?

A. Yes, ma'am.

MS. FONTENEAU: That's all I have got.

THE COURT: All right. You are not calling him back, correct? We all agreed that all the questions would be --

MS. POSEY: Yes, Your Honor.

THE COURT: All right. So at this point, you are allowed -- well, I don't know what instructions they have given you.

You are free to go as far as I am concerned which means you can stay in the room and watch, you can go home, whatever you would like to do.

THE WITNESS: Can I watch just a little bit?

THE COURT: Sure.

THE WITNESS: It's the first time I've been in court.

THE COURT: Well, very good. You are now free to sit in the audience and watch.

THE WITNESS: Thank you, sir.

THE COURT: All right. Ms. Fonteneau, you can call your next witness.

MS. WILSON: We would like to call Lieutenant Epps.

THE COURT: All right. If someone will get

Lieutenant Epps.

(Brief pause)

THE COURT: You will come around that corner, and you can stand behind the chair.

You may proceed.

COURTROOM DEPUTY: Raise your right hand.

(Witness sworn)

COURTROOM DEPUTY: Thank you. You can be seated.

THE COURT: All right. You may proceed.

DIRECT EXAMINATION

BY MR. WILSON:

Q. Good morning, Mr. Epps. Can you please state your full name for us?

A. William Epps, Jr.

Q. And, Mr. Epps, you used to work at FCI Talladega as a lieutenant, correct?

A. Yes.

Q. When did you start working there?

A. I believe 2000 -- January 2011, I believe.

Q. Okay. And when did you leave FCI Talladega?

A. I think February 2016 or '17.

Q. Would you dispute that it is 2017?

A. Yeah.

Q. You would dispute that it was 2017?

A. 2017, yeah, I think that is when I went.

Q. Okay.

THE COURT: Do you mind -- do you see the microphone? Will you pull it down just a little bit below your mouth, and that way it will go into the court reporter.

THE WITNESS: All right.

THE COURT: All right. There you go. Go ahead.

Q. (By Ms. Wilson) And as a lieutenant, what were some of your typical job responsibilities?

A. Maintaining safety and security of the institution, rosters, supervising the correctional staff.

Q. Can you describe what, if any, experience you had with working with the Special Investigative Services?

A. I was a SIS technician in USP Atlanta. I can't remember what year it was.

Q. Okay.

A. And an SIS lieutenant in Talladega.

Q. And let's talk a little bit about drug testing procedures in the prisons since you worked with those.

If you find a substance on an inmate, does the prison always use NIK tests to test the substance?

A. That's what we used to test drugs.

Q. Okay. And so is it policy to use NIK tests if there's a substance found?

A. Yes.

Q. And if you find a substance on someone and you decide

to use a NIK test, do you typically follow that up with a urinalysis test?
A. It depends.
Q. Can you? Can you follow that up with a urinalysis test?
A. You could.
Q. Okay. And when you were -- when you were in the prison, how often would they train on the use of NIK tests?
A. Who?
Q. The prison?
A. Test who? Can you reask the question? I am not understanding your question.
Q. Okay. So when you were in the prison, how often would they train on the use of NIK kits for the people that used them, such as technicians?
A. I don't know that answer.
Q. But for SIS technicians, are they typically trained in NIK tests?
A. Yes.
Q. And so on November 1st, 2016, were you part of an investigation into Mr. Antwon Jenkins for having a brown piece of paper with some kind of liquid on it?
A. Yes.
Q. I want to introduce Exhibit 19. Can you tell me what this document is?

A. It is a memorandum that Officer Green wrote.
Q. Okay. And it looks like it was sent to you, correct?
A. Correct.
Q. And it says it was on November 1st, 2016, correct?
A. Correct.
Q. Okay. So it says here that he conducted a random pat search on Inmate Jenkins with his number and found a brown piece of paper that was soaked in some type of substance. I took the brown paper to the SIS office, correct?
A. Correct.
Q. And when it comes to that specific day, were you there to view the results of the drug test for Mr. Jenkins?
A. Repeat your question.
Q. When it comes to this specific day, were you able to view the results of the drug test for Mr. Jenkins?
A. I probably was.
Q. Okay. And is it usual practice for you to go and check out the results or look over the paperwork when there is a testing?
A. I look at the evidence when the incident report is returned -- is turned into the lieutenant office.
Q. Okay. And as a lieutenant, if you are named on the incident report, would you always look at the photo sheet that came with that report?
A. I mean, "always" is a definitive word. I mean,

sometimes I look at it -- I'd look at the evidence.
Q. Okay. Would you typically look at all of the evidence if you were provided it in an incident report?
A. I would look at the test, yeah, and some of the memorandums, yes.
Q. Okay. I want to go on to Exhibit 18. And can you tell me what this document is?
A. That's an incident report.
Q. Okay. And is this the incident report for Mr. Jenkins on November 1st, 2016?
A. Yes.
Q. Okay. And then if we go down -- I think it is to page 2 -- oh, it might be page 3.
This is your name and signature, correct?
A. Correct.
Q. Okay. And in your job as lieutenant, is it your role to review the procedures in these reports and sign off on them?
A. Yes.
Q. Is it your role to review this and make sure there is enough evidence to move forward?
A. Yes.
Q. Okay. And so you determine from the report that the drug tests for Mr. Harvell, which was performed, was enough evidence to determine that Mr. Jenkins had amphetamine on him?

A. Yes.
Q. And the drug tests performed by Mr. Harvell was the only evidence that was used to place Mr. Jenkins in the SHU, correct?
A. Correct.
Q. Okay. And so let's look at Number 24 here. So this appears to be an area where you have identified and advised Mr. Jenkins of his rights, and he provided a statement, correct?
A. Yes.
Q. And his statement was that the paper has Vasoline on it. It is Vasoline for my nose. It is not drugs. No further comment. Correct?
A. Correct.
Q. And whenever he made these statements to you, did he make these statements directly to you?
A. Yes.
Q. And do you remember if Mr. Jenkins asked you to perform a urinalysis test on him?
A. No.
Q. You don't remember or you --
A. I don't remember.
Q. Okay. And do you remember if Mr. Jenkins asked for you to perform more tests to verify?
A. No, I don't remember.

Q. Okay. So if you are going to use a NIK test, do those kits come with instructions?
A. I think there are some instructions inside the box.
Q. Okay. And are those -- are there any other policies that you can think of or procedures that you would use other than the NIK kits with those instructions to do the test?
A. Repeat.
Q. Yeah, that was probably poorly phrased.
A. Yeah.
Q. Can you think of any other policies or procedures that you should follow other than those instructions when doing one of the tests?
A. Well, we follow our policies and our procedures when we do the test.
Q. Okay. What policy and procedure would that be?
A. We test the contraband with the NIK test kit.
Q. Okay. And that is the -- if you are testing a substance, the NIK test is the only way that you would test it, correct?
A. Correct.
Q. It has been adopted by the Bureau of Prisons?
A. Correct.
Q. Okay. And I want to introduce Exhibit 15. Do you recognize these as the instructions that come with those NIK kits?

A. Correct.
Q. Okay. And are these the instructions that were -- pertain to NIK kit Tests A and U?
A. One more time.
Q. I'm sorry. It is a tongue twister.
Are these the instructions that would pertain to NIK test Kit A and U?
A. Well, this is our flowchart. It is for all the drugs.
Q. For all of the drugs, okay.
And so let's go down to page 2. Are you supposed to follow the flowchart?
A. We follow -- yes.
Q. Are you supposed to look at the instructions when performing a test?
A. I mean, you follow the flowchart.
Q. Okay. Are you supposed to read the instructions on how to perform the test?
A. I am not understanding. What do you mean? Every time I take a test, read the instructions? No. I follow the chart.
Q. Are you supposed to follow the instructions even if you don't read them every time?
A. We follow the flowchart.
Q. So do you disregard the rest of NIK testing policies?
A. I'm not understanding what you are -- what do you mean?

Q. Do you follow all NIK instructions for how to use their tests?
A. We follow the flowchart.
Q. Okay. Let's move on to exhibit -- what did I -- well, you are right. Yeah, go on to page 2.
So this is a part of those instructions, correct?
A. Correct.
Q. And this kind of goes over the general testing instructions, correct?
A. Correct.
Q. And you should follow these instructions each time that you do a test, correct?
A. Well, this is -- when you have this test, it tells you what sequence on that thing, what to do when you put it in. Break 1, shake. Break 2, shake. That's the instructions that we have that we follow.
Q. And you have to follow them exactly, right?
A. Yeah. We follow that.
Q. And if you don't follow the instructions, then the test may not yield a correct result, right?
A. I can't answer that.
Q. Okay.
A. We follow the flowchart.
Q. But you agree that the test instructions are there for a reason?

A. Yes.
Q. And here it says, if we look under "liquid samples," that that the choice of paper is critical, correct?
A. Correct.
Q. It says, Never use brown paper, hand towels, or newsprint, correct?
A. Correct.
Q. And when an incident report is filled out, are you supposed to verify that the procedures were followed correctly?
A. Yes.
Q. Did you verify that the procedures were followed in this case?
A. I'm not understanding what your question is.
Q. Did you verify that the procedures were followed in the case with Mr. Jenkins?
A. I verified that there was contraband found, I verified that it was tested, and I verified that it was found on the inmate.
Q. And so you saw that the brown paper was used in the exams?
A. It was a picture of brown paper, yes.
Q. And so you knew that the wrong kind of paper was used in the test.
A. No. We tested the brown paper.

Q. But did you verify through the instructions what kind of paper was allowed to be used?
A. But it says liquid, a liquid sample. It was not a liquid sample. It was brown-soaked paper.
Q. And in order for something to be soaked in a substance, does that substance have to be a solid, a liquid, or a gas?
A. It was liquid-soaked paper.
Q. Okay. So if it was a liquid-soaked sample and it said "never use brown paper," did you verify that brown paper was not used?
A. I don't understand the question. Repeat it, please.
Q. Is there any way that you could have followed these instructions by placing brown paper in the solution?
MR. HOOD: Object to the form. Foundation. That's not what the evidence shows.
THE COURT: All right. The question is, is there any way you could have followed these instructions by placing brown paper in the solution. I mean, the evidence does show that the brown paper was placed in solution. So I will overrule.
A. My interpretation is of us putting it in something and then testing it, not it being already soaked when we found it.
Q. Can you point to a place in the instructions where it says that that makes a difference?
A. Liquid -- it is not designed for liquid samples.

Liquid to be tested is placed on the tip of the NIK test -- NIK-substance-loading device.

So that's how I interpreted it. You take something. You put it in there. Because there might be enough for that sample, you might put it on a Q-tip and drop the Q-tip in there and do your testing through that.

Q. But can you point to a place where it says that how the -- or that the way in which -- how am I trying to say this?

Can you point to anywhere in the instructions where it says that it is okay to use brown paper in the test kit for any type of sample?

A. No, I can't.

Q. Okay. And bear with me. I want to show Exhibit 12.

Can you tell me what this document is?

A. It is an administrative detention order.

Q. Okay. And it looks like it is a -- it's from you to the special housing unit officer, correct?

A. Yes.

Q. And it says it is for a placement of Antwon Jenkins in administrative detention, correct?

A. Yes.

Q. Okay. And so this document would show that you suggested that Mr. Jenkins be placed in administrative detention, correct?

A. Yes.
Q. And that was for -- or that was due to your review of the incident report, correct?
A. Yes.
Q. Okay. Let's look at Exhibit 16, page 44.
And so this is part of the NIK-test testing procedures, correct, training procedures?
A. Yes.
Q. And it says here on this page for testing liquids: It is not recommended to use cotton swabs as the cotton may react with some of the chemicals and cause an erroneous color reaction, correct?
A. Correct.
Q. And then it says right above that: The paper should be unscented and uncolored. Do not use brown hand towels or newsprint, correct?
A. Correct.
Q. And you testified just a moment ago that sometimes you guys use cotton swabs for these tests, correct?
A. Correct.
Q. And you shouldn't be using those according to the NIK test procedures as well, correct?
A. Correct.
Q. Okay. And you definitely shouldn't be using brown paper hand towels or newsprint, correct?

A. Correct.

MS. WILSON: I think that's all I have for now.

THE COURT: Okay. Government.

MR. HOOD: Sure.

CROSS-EXAMINATION

BY MR. HOOD:

Q. Mr. Epps, describe to what extent, if any, you had any feelings of malice towards Mr. Jenkins.

A. I didn't even know who he was.

Q. To what extent, if any, did you witness any other Bureau of Prison employees show any kind of malice towards Mr. Jenkins?

A. I don't have any.

Q. Excuse me?

A. I don't have any knowledge.

MR. HOOD: Okay. That's all I have.

EXAMINATION

BY THE COURT:

Q. All right. Just a couple of things. I was rereading through the report. You interviewed Mr. Jenkins about an hour and 20 minutes after the brown paper. I know you don't know the exact time. Does that sound about right? It was within an hour or two after the paper was taken?

A. Probably so.

Q. According to your report, he told you that the paper

had Vasoline on it and that the Vasoline was for his nose.
Do you remember him saying that?
A. Yeah. Well, that's what I put in my report.
Q. Do you have any reason to know -- in other words, did you do anything to check whether or not it was Vasoline or whether or not what he was saying about needing the Vasoline was true or not?
A. Here's what we normally tell the inmates. You carry it in its original form. So if it is Vasoline, you carry the Vasoline in the Vasoline bottle. When you carry other stuff and you put it in plastic bags or you put it on paper, it causes things for -- things like this whereas we don't know what it is. If he would have kept it in the container, we would have seen that it's Vasoline in the container.
When you carry stuff that we have no knowledge of what it is and you are in an institution where you get people that send in drugs through the mail -- put it on paper, put it on cards, put it on Bibles when you send it in -- when we see something like that, it is our due diligence to test it. And that's why these things come up when you do test it.
So no, I didn't, and -- because it was tested with a NIK test kit, and it came out for amphetamines.
Q. Did you ever see the actual piece of brown paper?
A. No.
Q. Do you know what happened to it?

A. No, I don't.
Q. One of the allegations that Mr. Jenkins later made was that you instructed others to dispose of the paper. Did you ever tell anybody what to do with the paper?
A. No, sir.
Q. All right.
A. When I get it, it is usually -- they just give me the incident report with the pictures and the things like that. And I look at it and I see that it was tested. I see what -- if the incident report is true in its facts, and then I move on. Because with this, once it is written for a 100-series shot, it has to be processed through the disciplinary hearing system. I just can't say: I am going to throw it out. That's why we have a new system that they created so that the hearing officer can hear the incident report.
THE COURT: Okay. Anything else?
MR. HOOD: Just one.
THE COURT: Well, Plaintiff first.
MR. HOOD: Oh, sorry.

REDIRECT EXAMINATION

BY MS. WILSON:
Q. Mr. Epps, just to follow up with His Honor's questions: Do you remember for certain whether or not you said to keep the rest of the paper?
A. I don't -- we don't destroy evidence. I don't tell

anybody to destroy evidence.

Q. But do you remember in this specific circumstance what you had said about the paper?

A. I would never destroy evidence. So that is not true.

Q. Okay.

A. And I wouldn't call over to Harvell and say, Get rid of the evidence, because of -- it is evidence. It is evidence. We don't destroy evidence. I have no reason to destroy evidence.

MS. WILSON: Okay.

THE COURT: Mr. Hood.

RECROSS-EXAMINATION

BY MR. HOOD:

Q. Lieutenant Epps, you were not the -- I just want to make sure the record is clear. You were not the decision-maker that decided to put Mr. Jenkins in the SHU, are you?

A. No. And that was the thing: Once he goes to SHU, somebody prepares -- the officer prepares a detention order putting him in. We are mandated if it's a 100-series shot or a 200-series shot that he has to be placed in the special housing unit. That's our policy, so I couldn't dictate for him to stay out.

Once it was written and it was given a report number, he had to go to the special housing unit.

MR. HOOD: That's all I have, Judge.

THE COURT: All right. Anything else?

MS. WILSON: I think I have one more.

THE COURT: Okay.

FURTHER REDIRECT EXAMINATION

BY MS. WILSON:

Q. If we go back to Exhibit 16 on page 16, so in the second paragraph, Mr. Epps, it says, A positive prediction color change is only a presumed positive result for the suspected compound. In no way should the test results be considered a confirmation of identification. Many manmade or natural chemicals could produce a positive indication for the presence of an illicit substance.

Is that what it says?

A. Yes.

Q. And you agree that you didn't do anything to investigate whether or not it was actually Vasoline on the paper?

A. No.

MS. WILSON: That's all I have.

THE COURT: Anything else?

MS. FONTENEAU: One more.

MS. WILSON: Sorry.

THE COURT: All right.

Q. (By Ms. Wilson) And it is the information that was in

this investigation that was used in the DHO investigation, correct?
A. One more time. I'm not understanding.
Q. It was this incident report -- not this incident report, but it was the incident report in this investigation, investigative findings, that was used in the DHO investigation, correct?
A. You have lost me.
Q. Okay. So there was an administrative hearing after this, correct?
A. Correct.
Q. And the evidence in this investigation with Mr. Harvell and yourself is the evidence that was used in that hearing, correct?
A. What was contained in that incident report, yes.
MS. WILSON: Okay. That's it.
MR. HOOD: Nothing further.
THE COURT: All right. May he be released?
MR. HOOD: Yes.
THE COURT: All right. You are free to go, which means you can either stay here and watch or you can go home. It is totally up to you. I am not going to ask what you prefer.
(Witness excused)
THE COURT: Why don't we take lunch?

MS. FONTENEAU: Thank you, Your Honor.

THE COURT: Is that good with everybody?

MR. HOOD: Sure.

THE COURT: All right. Who are our next witnesses going to be?

MS. FONTENEAU: Actually, we are not going to call the inmate from prison.

THE COURT: Okay.

MS. FONTENEAU: We are going to call Mr. Jenkins, and then we will rest.

THE COURT: Very good.

MR. HOOD: That's good.

THE COURT: All right. It is 11:45. Let's start back right at 1:00 o'clock.

MS. FONTENEAU: Thank you, Your Honor.

THE COURT: Thank you.

(Lunch recess taken from 11:43 a.m. to 1:05 p.m.)

THE COURT: Ms. Fonteneau, call your next witness.

MS. FONTENEAU: We call Mr. Antwon Jenkins to the stand, Your Honor.

THE COURT: All right. You can go ahead and swear him in.

(Witness sworn)

(Discussion off the record)

THE COURT: All right. You can proceed.

***

## DIRECT EXAMINATION

BY MS. FONTENEAU:

Q. Can you state your name for the record?
A. Antwon Deshane Jenkins, Jr.
Q. And where are you current -- where do you currently reside?
A. In the BOP. I'm currently housed at Forrest City Low.
Q. Where is that?
A. That's in Forrest City, Arkansas.
Q. Okay. And have you always been incarcerated there?
A. No, ma'am. From 2014 to 2013, I was housed at FCI Talladega in Talladega, Alabama.
Q. Okay. And in that -- was that the first place you were located in the -- you were sent in the Bureau of Prisons?
A. Yes, ma'am.
Q. Okay. Now, when -- from you said 2013?
A. From September 2014 to July 2023.
Q. Okay. And from the time that you were incarcerated until November 1st, 2016, had you had any disciplinary infractions?
A. No, ma'am.
Q. Had you ever been -- had you ever tested positive for any illicit substances while you were in BOP up until November 2016?

A. No, ma'am.
Q. Had you ever been searched and found to have any elicit substances on your person from 2014 until November 1st of 2016?
A. No, ma'am.
Q. Now, I want to talk to you a little bit about November 1st, 2016. Do you recall anything out of the ordinary occurring on that day?
A. Yes. Me and I will say probably about three or four fellow inmates, we were exiting the recreation yard at Talladega and Officer Taylor Green pointed at me and told me to come to him so he could do a random pat search.
Q. Okay. And did you -- did you submit to that pat search?
A. Yes, ma'am.
Q. Okay. And when you were searched, was there anything taken from you?
A. Officer Green first asked me to empty my pockets, and I had a brown piece of paper with Vasoline on it. And he asked me what was it. And I explained to him it was brown paper with Vasoline on it because it was kind of cold outside and I used it for my nose and my lips.
Q. What do you use it -- how do you use that for your nose and lips?
A. At the current time, the commissary didn't have any

ChapStick, so I would use Vasoline for my lips and my nose because it gets cold and my nose gets dry and it kind of, like, cracks and sometimes it bleeds a little bit.
Q. Okay. And do you have Vasoline in your cell?
A. Yes. I had a jar of Vasoline in my cell, but in a prison context, for a man to walk around with a bottle of Vasoline, they may think that he's trying to do something inappropriate as far as -- excuse my language -- but like masturbating or something like that, so I chose not to have the whole jar of Vasoline with me.
Q. Okay. And how big was the jar?
A. It was probably a standard-sized jar. Maybe about that big (indicating).
Q. Would it even fit really in your pocket?
A. No.
Q. Okay.
THE COURT: It wasn't the travel size. You are talking about the normal big size --
THE WITNESS: Prison size, yes.
THE COURT: -- that you buy at the store.
THE WITNESS: Prison size, yes. Prison size, yes.
Q. (By Ms. Fonteneau) Could you even walk around with the, you know, big jar in your pockets for your --
A. No.
Q. Would it fit in your pocket?

A. No, it wouldn't.
Q. Okay. Now, did you -- now, when the paper was discovered, did Taylor Green say anything to you?
A. Taylor Green immediately suspected it to be a drug or a narcotic and he asked for my ID.
Q. And did you provide that?
A. Yes. I gave him my prison ID, and he told me that he was going to send it to the lieutenant's office and he will get back with me later.
Q. Okay. And where did you go at that point? Did you go back to your cell or somewhere else?
A. No. We were leaving the recreation yard to go to the -- in prison, it is called the chow hall, the dining area. It was time for us to go eat.
Q. And what happened after you went to eat?
A. Upon exiting the chow hall, Officer Taylor Green was standing outside of the chow hall, and he called me again and questioned me once again about the substance of the paper that he found in my pocket.
Q. What did he -- what did he ask you?
A. Are you sure that it is not drugs? Is it drugs?
Q. And what did you say?
A. I said, Sir, it has -- it is a paper that has Vasoline on it. You can see that it has Vasoline on it. I don't -- I don't do drugs.

Q. Okay. And what happened next?
A. I went back to the rec yard for maybe 15 minutes, and then there was an announcement over the intercom on the rec yard for me to report to the lieutenant's office.
Q. Okay. And do you know what lieutenant that was that you were supposed to report to?
A. I didn't know until I got to the lieutenant's office, but it was Lieutenant Epps.
Q. Okay. And was that the person who was here earlier?
A. Yes, ma'am.
Q. Okay. And when you -- did you go to Lieutenant Epps' office?
A. I went straight from the rec yard to the lieutenant's office, and, you know, the officer is going to escort you up there so you can't, you know, toss anything or however that goes.
Q. And did you toss anything?
A. Of course not, no, ma'am.
Q. And so when you got to Lieutenant Epps' office, were you there alone, or were there other people there?
A. It was me, Lieutenant Epps, and a correctional officer by the name of Sanders.
Q. And when you were in the -- were you -- did you speak to them or -- what happened when you got there, essentially?
A. When I came inside the lieutenant's office, Epps

immediately said that, hey, you had some paper on you and it tested positive for amphetamine. So I questioned Epps and said, you know -- you know, it was Vasoline on the paper; how could it test positive for amphetamine?

Q. And what did he say?

A. And Epps said, That's what the test said. You are going to the SHU.

Q. Okay. And so was that the end of the conversation?

A. No. Prior to you going to the SHU, the correctional officer, Sanders, they -- he was up there to -- they actually pat you down before you go to the SHU to make sure, of course, that you don't have anything else on you. And Officer Sanders patted me down and found the second part of the paper in my pocket. And he got it out and he held it up. And I told Lieutenant Epps, Epps, this is a part of the same paper that Taylor Green got. It's just paper with Vasoline. And Lieutenant Epps took the paper and threw it in the trash can. And I asked him could he get it -- could he keep it and get it tested or at least compare it, and he said no.

Q. Did you ask them to do anything else?

A. Yes. I was adamant about asking them to have an outside source test the paper, but they -- you know, they kept telling me that the NIK test is BOP protocol.

Q. Okay. At that time, did you know anything about how a NIK test was supposed to be administered?

A. At that particular time when I was in the lieutenant's office, that was my first time hearing about a NIK test. I didn't know anything about it.
Q. Okay. Now, after that conversation in the or -- was that the entire conversation that you had in the office with Epps and Sanderson?
A. It pretty much just consisted of me asking him to pretty much look into it and see that it is not a narcotic. It is just a paper with Vasoline on it. That was pretty much the gist of the conversation.
Q. Do you know how many times you asked him to test the paper differently?
A. I am going to say -- I am going to say at least four times, him and Sanders. And Sanders confirmed, you know, that -- he was like: That is a paper that has some Vasoline on it. But Epps -- you know, it was pretty much kind of like already set in stone already that I was going to the SHU.
MR. HOOD: Objection. That's hearsay.
MS. FONTENEAU: I believe it is a party admission, Your Honor.
THE COURT: I am rereading his answer. Him and Sanders confirmed it was paper that had some Vasoline -- overruled.
Q. (By Ms. Fonteneau) Now, so when you had the -- so that conversation -- when that concluded, what else did -- what

happened next?
A. Lieutenant Sanders handcuffed me and took me to the special housing unit.
Q. And where had you been housed before?
A. I was housed in the unit -- I was housed in the unit called Sigma A. It is for inmates that work in UNICOR which is like a prison industry where you can work to make money to put on your account.
Q. Okay.
A. It is kind of like a privileged housing unit.
Q. You were in privileged housing?
A. Yes, ma'am.
Q. Now, and you can work and put money on your books, is that what you said?
A. Yes, ma'am.
Q. And were you, at that time, working?
A. Yes, ma'am. I had been working for maybe almost two years or close to two years at this time.
Q. Now, what is the benefit of you putting money on your books? How does that help you, or what does it do for you?
A. For inmates whose family is not financially well off or stable, they are able to work and get paid maybe a dollar or 1.25 an hour for 30 days, and you can make money to have it put on your books, take care of court fines and restitution. You can also buy -- purchase commissary and food, like soap

and deodorant and stuff. You could eat without having to, kind of, put a burden on somebody on the outside.

Q. Why do you need to get commissary items or toiletries from the commissary instead of what the BOP provides?

A. Because the BOP -- they really don't provide you with too much as far as like hygiene and stuff like that. It's maybe -- it may be a small pack of deodorant and a small pack of soap and, like, a little-bitty toothbrush, and that's pretty much it. So you need to -- you know, especially a guy my size, you need to have a nice amount of soap and shampoo and toilet paper and stuff like that.

Q. Now -- so you said you went to the SHU?

A. Yes, ma'am.

Q. Okay. And when you got to the SHU, what were the conditions like?

A. When I first got to the SHU, they initially take you to a cell and they strip search you and take all your property off of you, and then you are housed to a cell, a SHU cell.

When you get in there -- well, then it was a cell maybe -- I want to say probably from this desk to that wall, maybe a little bit bigger, with two bunk beds and a toilet and a -- a toilet and a sink combined. It is big enough for you to put both arms on each wall. That's how small -- that's the size of it.

Q. Okay. And at the time that you went to the SHU, had

you been to the -- have an administrative hearing yet to determine whether you had done what they said you did?
A. No, no. The hearing is usually set maybe two weeks after you first enter the SHU.
Q. Okay. Now, when you were in the regular housing unit -- well, actually, you weren't in the regular housing unit. You were in the Alpha. Is that --
A. Sigma.
Q. Sigma Housing Unit. When you were in the Sigma Housing Unit, what was the cell like?
A. I would say maybe the size of this -- maybe two and a half, maybe three sizes of this actual box that I'm sitting in because they have lockers for you to put your belongings in, and then they have beds, and they have a table and chairs and a separate toilet and a sink. It's maybe, like, two -- two times bigger than the SHU cell, maybe.
Q. And in the SHU -- well, in the general cell that you were in, actually the Sigma cell that you were in, did you have the ability to leave?
A. Yes. We were in the general population. Unless the institution is on lockdown, you are able to -- as soon as they pop the door or open the doors at 5:00 o'clock in the morning, you are free to either go to work, go to recreation, clean your cell, exercise, go to school, work at UNICOR. You have the ability to do all this stuff until maybe around 3:30 or

4:00 o'clock is when they do a nationwide count in a federal prison.
Q. Okay. Now, when you -- you said you would go to work each day.
A. Yes, ma'am.
Q. And then what kind of clothing would you wear when you went to -- when you were in the Sigma cell block?
A. When you enter the federal prison system, they give you three button-up khaki shirts, three pairs of pants, some boots. And then when you go to commissary, you know, you can buy your tennis shoes and your sweat clothes and your -- you know, like, extra, like, amenities.
Q. Now, when you got to the SHU, you said they strip-searched you. Did they give you back the clothes that you had in Sigma?
A. No. You are just provided with one jumpsuit. That's it.
Q. You get one jumpsuit?
A. One jumpsuit, yes.
Q. And were you allowed to leave the -- let's talk about that first two weeks. Were you allowed to leave to go and do the things that you would have done in Sigma while you were awaiting the administrative decision?
A. No. When you are locked in the SHU, you are literally locked in a cell for 24 hours a day. And the only time the

door -- well, the door doesn't open, but anytime you get any kind of, like, air in there is when they open the chuck hole to pass out lunch. That's it. But you are not free to go anywhere.

Q. Now, what is the temperature like inside there?

A. In 2016, in November, the heat was on because it was really cold that year, so the cells was maybe at least 90 degrees or hotter inside of there.

Q. I want to talk to you a little bit about your physical health. Do you have any conditions that affect you? Do you have any medical condition?

A. Yes, ma'am. I have -- I have asthma. I have had asthma since I was maybe a toddler.

Q. Okay. And going back to this -- well, does the heat affect your asthma?

A. Of course, it does. It makes it -- it makes it hard -- with me being a bigger guy, first and foremost, a heavier guy, it really makes it hard for me to breathe when there's constant heat and you can't, you know, get any fresh air or get any, like, break from the heat.

Q. Now, when you were in general in Sigma housing, did you have medicine for your asthma with you?

A. Yes. I had an Albuterol inhaler. And at times -- this may have been later, but I was put on a -- what they call an Advair inhaler where you inhale, like, a powder that you --

you inhale and it coats your lungs. It's like a steroid kind of thing.
Q. Now, when you went to the SHU, did you have your inhaler or Advair with you?
A. No.
Q. Okay. And now, when you were in the SHU, are there any other differences in terms of the sanitation equipment?
A. When you are in the SHU at Talladega, they don't have -- I'm trying to think. You are not able to flush the toilets from the inside of the cell. The flushers are on the outside of the cell, so it is up to the officer when he does his round to flush the cell if he chooses -- I mean, flush the toilet if he chooses to.
Q. Now, how many people are in the cell when you get in the SHU?
A. There's going to be two.
Q. And I think you testified earlier that it was a small space that you were in.
A. A very small space, yes.
Q. And if you needed to relieve yourself, was there any way for you and the other person to get privacy?
A. Of course not. If you have to use the restroom -- to speak in a child's term -- Number 1 or Number 2, you take it while your cellie is laying there on the bed.
Q. Now, you said you were wearing a jumpsuit.

A. Yes, ma'am.
Q. Now, when you were in the SHU, if you needed to do Number 2, defecate --
A. Yes.
Q. -- how would you accomplish that with the clothing that you had?
A. You have to take your jumpsuit off and basically, you know, excuse me, be naked while you are sitting on the toilet and use the restroom like that, the bathroom like that.
Q. And when you were finished, would you be able to initiate a flush for that?
A. No, because the flush is on the outside of the toilet -- on the outside of the cell, so it is up to the officer whenever he does a round or whether he chooses to flush the toilet.
Q. And so there were two people utilizing those -- the facilities for each day using -- doing what people do all day; is that right?
A. Yes, ma'am.
Q. Now, how frequently were the toilets flushed?
A. It depends on the officer that's working. And usually, at best, once a day. Sometimes it may spill over into the next day because when you are in the SHU, there's so many people, and some people get angry or they may upset or agitate the officer and he may not flush the toilets as punishment for

everybody.

THE COURT: Now, let me ask you this: Is it one flushing mechanism for the entire hall, or is there one for each individual cell?

THE WITNESS: One for each individual cell.

THE COURT: So would that punishment -- I'm not going to flush your cell because I'm mad at you, or he just wouldn't flush anybody's?

THE WITNESS: He just wouldn't flush anybody's. He would just get up and just make a round and just wouldn't flush any toilets.

THE COURT: All right. Continue.

Q. (By Ms. Fonteneau) And so you were -- what temperature would you say that room was most days?

A. Around that time, it had to be at least 90 degrees in there to where you are literally sweating inside of the cell.

Q. And then you had human waste in the toilet next to you?

A. Yes.

Q. And what percentage of the time would you say you were sitting in a 90-degree room with human waste sitting right next to you?

A. Literally every day that I was in the SHU because normally, you know, when people eat food, you are going to at least go to the restroom at least once a day. Between one of us, one of us is going to use the bathroom at least once a

day.
Q. Now, when you were in the SHU, were you allowed out at any time?
A. They do -- they give you -- they permit you to have an hour of rec. It depends on the SHU lieutenant and the officer on what days and how often it is. But they may call rec maybe once a week, maybe twice a week at most.
Q. Now, when they call rec, where does that -- where would you go?
A. They would handcuff you before you go because anytime you leave out of the cells in the SHU, you have to get handcuffed in the back, and they would walk you to a rec yard outside that resembles a dog pen. It's a big -- it's a big cage thing, and it has individual -- like, individual walking spaces with doors on it, but it's all, like -- made like the chain-link fences.
Q. And when you go outside, did you have any -- so what were you wearing when you were going outside?
A. Just my jumpsuit.
Q. Did you have any outerwear?
A. No. They don't provide you with any outerwear while you are in the SHU, and you are not able to purchase any commissary or any clothing items while in the SHU.
Q. Now, if you choose to go out for rec, can you come back in at any time?

A. No. Rec usually lasts maybe two hours or maybe an hour. It just depends on which officer it is. Sometimes they will let you go a little bit more, but once you are out there, you are out there. Until the officer says otherwise, you are just out there.
Q. And so if the temperature was cold outside and you had a jacket and you had your jumper on, would you be able to knock on the door and say, hey, it's cold; I would rather just go back to my cell?
A. No. They are going to tell you, once you come out, you are out there. You are stuck out there until they open the door back.
Q. Now, what about showering? What would happen? How would you shower in general population in the Sigma unit every -- could did you shower anytime you wanted?
A. In general population, you can take a shower as many times as you want, whenever you want, unless they are doing a count. So yeah, anytime throughout the day except between 4:00 and 4:30 and, like, after 10:00 o'clock or 9:45 when they are locked down, but anytime, you could take as many showers as you wanted to.
Q. Now, when you got to the SHU, were the procedures around showers the same?
A. No. They were very different. In the SHU, they said that you are supposed to take a shower Monday, Wednesday, and

Friday. But once again, it just depends on the officers because sometimes the morning shift will put it off on the second shift, and the second shift will put it off on the morning shift. So sometimes you may take one shower a week; sometimes you might take two. Sometimes you might not take a shower until maybe Friday. It all just depends on the officer and how the officer is feeling.
Q. And did you have any way to clean yourself if you weren't getting a shower?
A. No, because when you take a shower, that's the only time that they provide you with clean clothes -- or a clean set of clothes and, you know, soap and a towel and stuff like that.
Q. And then -- but when you would get to the shower, what was the shower like in the SHU? Can you describe it?
A. Okay. Once again, anytime you leave out of the cell and the SHU, you are going to have to be handcuffed backwards. So they handcuff you through the chuck hole, you and your cellie, and they take you to the shower. And the shower is probably -- I'm going to say maybe half of this -- maybe a little bit bigger than this square that I'm sitting in. And they push the gate closed and lock the gate. And then they have you to put your hands through the chuck hole and they take the handcuffs off of you and they press the water button. And the water button may run ten minutes or something like

that. And you have to call the officer again to, you know, come to -- press the button again to get some more water, but it is always -- there was always dirty clothes, hair, feces, urine inside of the showers. The whole shower would be coated with nothing but dirty clothes.

Q. Why would the -- so when you would go into the shower, you would have the clothes that you were wearing on?

A. Yes. And pretty much everyone just takes their clothes off -- takes their old clothes off and just leaves them in the shower and just changes and puts their new clothes on and just leaves the dirty ones in there.

Q. Okay. And so is it your testimony, then, that when you got into the shower, it was not clean for you to get in?

A. No.

Q. Okay. And can you describe, like, how full of dirty, wet, soiled clothes the shower would be?

A. It literally covered the whole floor of the shower and maybe -- I don't know how much this is, but probably about -- sitting up that much, we are talking about maybe a hundred people that is in the SHU, rotating the showers, so probably off the floor maybe that much (indicating).

Q. Now, did you -- were you able to go to your job when you were in the SHU?

A. How it works in federal prison, once you catch -- once you are sanctioned for 100-series shot, which is the worst

sanction that you can catch at the BOP, you are automatically fired from your job and put on what they call maintenance pay where you have to -- you can't make over $5.75 per month for I think maybe like a year or two. I don't know exactly the time, but you automatically are fired from your job.

Q. Okay. And then -- so did you in fact lose access to your job?

A. Yes.

Q. And what was the result for you after you left the SHU in losing your job? Like, how much -- how did that affect you monetarily?

A. Whew. Like I said, I --

MR. HOOD: Judge, I object to this. We raised in the pretrial order on page 8, Plaintiff has failed to meet the obligation to disclose and specify and clearly state compensation of any category of damages claimed by the plaintiff as a result of the defendant's conduct. And to date, we have received nothing.

THE COURT: All right. I am going to overrule the objection and let him answer. I am not overruling your ability to raise that in posttrial briefs as an exclusion. But just for the record, I want him to get out the numbers in case I find that it is preserved.

MR. HOOD: Sure.

THE COURT: So you can answer the question.

Why don't you reask it so he can --
THE WITNESS: Please, please.
Q. (By Ms. Fonteneau) Was there any loss to you financially for that -- for the time that you were unable to work?
A. Yes. Unfortunately, you know, I'm not -- I don't have, you know, someone on the outside that has an influx of money to send me. So this was, like, the only way that I was maintaining in prison. So once I got out of the SHU, I wasn't able to work at UNICOR anymore, and I was just subjected to making $5.75 a month.
Q. And for -- irregardless of the amount of money that you lost, what was the affect on your life in -- in general population for not having that money?
A. It was hard. It was difficult because I didn't, you know, really know, like, how I was going to be able to purchase, like, the minimum. You know, the BOP feeds you food, so I can eat food from the BOP, but hygiene, you know, as far as being able to bathe myself, to buy soap and buy legal supplies and mailing envelopes, it was impossible.
Q. Now, those mailing envelopes, were those things that you would use in -- I want to -- just kind of backing up a little bit, have you filed any appeals in your cases?
A. In my criminal cases?
Q. Yes.

A. Yes, I have.

Q. And how many appeals have you filed?

A. In both -- I have two unrelated federal cases that I am in prison for now. I filed a successful appeal in the first one to the Court of Appeals, and the Supreme Court granted it and vacated one of my sentences. And in my other case, I filed a postconviction motion, and I had -- the Court, on a motion of the government, dismissed a conspiracy charge for me.

Q. And were you working on those appeals yourself?

A. Yes, ma'am. Pro se.

Q. And so did you need access to certain supplies in order to do that?

A. Yes, ma'am, because we don't have -- we don't have computers or anything in prison, so if you are not going to handwrite them, which, you know, of course the courts will accept them, you have to buy, like, typewriter ribbons and typewriter wheels and it kind of makes it difficult when you don't have any money. That's why I have to handwrite a lot of the things and borrow stuff from people to kind of like make it work.

Q. And at the time that this was going on, were any of those appeals pending?

A. Yes. Actually, when I went to the SHU, both of the -- the appeals in both of my cases were pending, and that's kind

of what was the driving force for me to attack this amphetamine shot because I knew that I'm in prison for some serious charges. And my prison conduct and my character is going to be based on something moving forward, so I know that if I had this sanction on my record when I went back to court, I could potentially blow my chance of, you know, at least having my sentence reduced, if -- some, if at all.

Q. And when you -- and so what did it make you feel -- how did it make you feel to have that new shot holding over your head while you were trying to get your sentences reduced?

A. I felt like my world was being turned upside down because, you know, I am in prison, and I can't escape the things that I was convicted of to be in prison. I can't change that. But what I can change is moving forward. So I am in prison and I am working and I am doing what is right and I am staying out of trouble. And then this comes, and it turned my world upside down because I don't know -- I really don't know what to do now. So I didn't have a choice but to try to, to the best of my knowledge, to try to figure out: How can I be heard, or how can I get someone to listen to what I am saying about this sanction? So it really -- it really took a big emotional toll on me for sure.

Q. Now, when you got into the SHU and you realized that, you know, the -- potentially that the shot could be used against you later, what did you do?

A. I began to try to figure out what this NIK drug test was and how could they use it to test -- to test the paper and say that there was amphetamines, so I figured in my mind that I had to do something to at least get the instructions to try to figure out what -- how does it work and then try to figure out -- because when I first got back there, Lieutenant Epps did what they called a "rounding issue" where he walks around, you know, just walking, walking around. So I was able to stop him, and I asked him to -- would he pull me out of the cell? And he pulled me out of the cell and he took me to -- they have a law library there. Like, everything is kind of like lock-and-key back there. So, you know, I spoke to him.

I didn't know him personally. We never had any interactions before that. But, you know, he is a -- known as kind of a really strict guy. But, you know, I say -- you know, I say, Epps, you know like I know, you know, this thing -- this brown paper has Vasoline on it. And I am just trying to get somebody just to test it on the outside. And he looked at me and he said, Well, listen. You might be right. And it is a possibility that I believe you that it is Vasoline on the paper. He said, But you have got to go through the process, and that's all I can say.

So I asked him again, Is there anything that you can do as a lieutenant? And he said, Just go through the process.

So while I'm in the SHU and I'm trying to figure out

how to get this, I was trying to figure out what the process was, and that's how, you know, I figured out about the administrative remedies and things like that.

Q. And so you found an administrative case?

A. Yes. After --

Q. An appeal?

A. After the DHO officer found me guilty, that's when I filed the administrative remedy, yes.

Q. Well, how did you learn that the NIK test kit procedures had not -- had been used to test -- well, improperly used to test brown paper?

A. I was able to receive the instructions.

Q. How did you get them?

A. I just so happened to have -- you get one phone call in the SHU. And instead of me calling my family and, you know, letting them know that I'm in the SHU and they think that I'm in prison doing crazy stuff, I called the secretary of one of my old lawyers and I asked a favor of her. I said, I need you. Please, can you Google this? Can you send me the instructions to this test?

And she did it.

Q. Okay. And when you got the instructions to the test, what did you find?

A. I found that the SIS technician did not follow the proper steps to test the substance. I seen that you are not

supposed to use brown paper. It was just -- it was a bunch of things that kind of raised red flags with me. But like they say, the truth is only the truth if someone wants to listen to it, so.

Q. Now, when you learned that the test, you know, had not been done according to what the instructions said, what did you do?

A. I filed -- first, I talked to the former warden, Warden Clay. And when she stopped by the door -- because she would do her rounds likewise, maybe once a month or something like that. And by then, I had been, you know, griping so much about it, I was known as the Vasoline guy.

And so she said, Okay. You are the Vasoline guy.

And I said, Listen, you know -- and I explained to her my situation with the -- that I had an appeal pending, that this could possibly affect that, that I just wanted somebody to just look into it for me. And she told me to go through the process.

So that's when I filed the administrative remedy to the Atlanta -- the regional -- the Southeast regional office in Atlanta for the BOP.

Q. Okay. And then what happened with that first appeal?

A. The regional office agreed with the DHO officer and said that they were crediting the officer's incident report. Whatever his statement was and the evidence that they

reviewed, that was sufficient to find me guilty for amphetamines.

Q. And did you -- what happened next?

A. When I was released from the SHU, I emailed Warden Clay, Assistant Warden Joseph, Captain Watson. He was the captain there. I talked to whoever would listen. You know, by then, everybody is thinking I'm delusional, that I'm the Vasoline guy, and I just wrote them emails and said, Hey, this is my situation. I'm trying to -- can you please intervene in this situation because I have an appeal pending, and I just don't want to, you know -- and I would just always be told to go through the process.

Q. Now, after you did the -- I think you said regional --

A. Oh, I'm sorry. I'm sorry.

Q. What happened next?

A. I filed an appeal -- an appeal to the BOP general counsel in Washington DC -- appealing the regional office's denial. And I, once again, included the NIK drug test instructions, the emails to the wardens and the captain, and they did not answer.

Q. Now, what, if anything, happened after that?

A. Once again, I wrote a follow-up letter to the general counsel in DC. They did not answer. And then in November of 2017, I filed a 2241, which is a habeas motion, in the Northern District of Alabama.

Q. And do you remember which judge it was assigned to?
A. The magistrate, no, but it was assigned to Judge Ott.
Q. And let -- I think -- if the record reflects that Judge Ott was a magistrate judge, do you --
A. Okay. I'm sorry. I just remember it was Ott, yeah.
Q. And what happened after you filed the 2241? And you did that yourself?
A. Yes. I wrote it -- I was actually -- my case had gotten overturned in February of 2017, so I am still fighting -- I'm still trying to get the sanction off of me. So I am actually in the county jail waiting for resentencing when I filed the 2241 in Birmingham.

And within three weeks, the BOP sent me a letter and it was a -- it was a piece of paper letting me know that my sanctions had been expunged and that the BOP logistics -- it was a young lady with the last name of Lykes or Dykes or something like that. She sent the affirmation saying that my record was -- that my shot was expunged and that my record was clean.
Q. Now, that time that -- what did that -- what effect did that have for you when they expunged it?
A. That means that I received my good-time days back. The visitation sanctions had already ran its course because this was, like, a year later, and it means that I wasn't guilty of possessing amphetamines.

MR. HOOD: Object to the form. That calls for a conclusion, Judge.

THE COURT: Overruled. I mean, I understand it is not a determination of guilt or innocence, but it is a determination that the sanctions would be removed.

THE WITNESS: Yes.

Q. (By Ms. Fonteneau) But at that point when that was removed, had you served time in the SHU?

A. Yes, yes. I had -- I had been off the SHU maybe nearly 12 months by that time.

Q. Okay. Now --

MS. FONTENEAU: Just one second, Your Honor.

THE COURT: Okay.

(Conferring)

Q. (By Ms. Fonteneau) Now, let me go back just a little bit to your time in the SHU. Did you have any medical issues while you were there?

A. While I was in the SHU, I suffered two asthma attacks and contracted staph infection on the middle of my face.

Q. Okay. Well, tell me about -- your asthma, is it severe enough for you to need to have medicine regularly?

A. Yes. Throughout my entire incarceration, I have always had two -- like, when you are in the general population, you can have your -- I can have my asthma inhalers on me at all times. So to this present day, I still have both of them on

me at this present time.
Q. Okay. You have them with you now?
A. Well, not coming to court, but in the county jail, you know, you can't bring anything to court, so yeah.
Q. Now, when you got into the SHU, how were you -- how was your asthma affected?
A. Maybe -- I think around -- the exact date, I don't know. But I know this was probably like the second week of November. It was so hot because there's not any, you know, any air rotating in there. I had an asthma attack I think, like, after 10:00 o'clock or something like that.
Q. Now, I want to ask you a little bit also about another difference in the SHU and general population.
How do your cells get cleaned in the -- in, like, the Sigma unit that you were in?
A. They have what they call, like, a mop closet. So they have multiple mop buckets, big barrels of cleaning solution, brooms and mops where you can actually clean your cell literally a million times a day if you want to. You know, you have got a lot of guys that are neat freaks in prison, so they clean their cells all day long: wipe the walls down, clean the toilets. They have got toilet brushes, solution so you can make sure that it is sanitary in there.
Q. And when you get to the SHU, do you have that ability to clean your cell?

A. No.
Q. Who -- how does the cell get cleaned in the SHU?
A. It doesn't get cleaned.
Q. And so you were in the -- how long were you in the SHU with your co-cellmate with the toilet that didn't flush in the heat without being able to clean it?
A. 45 days.
Q. Now, how did the -- what state was the room in as a result of that?
A. The room was disgusting. There was, you know, just trash and food particles and a lot of dirt. And like I said, with the toilet being like that, not being able to flush and the heat, it is kind of like the equivalent to -- if you -- like, kind of like a porta-potty at, like, a marathon race or a porta-potty at, like, a Fourth of July event or something like that. Like, imagine a porta-potty in the summer, dead of summer Alabama heat, and that's exactly how it was with dirt and filth on the floor.
THE COURT: Let me ask you this as a follow-up. You were in for 45 days, correct?
THE WITNESS: Yes, sir.
THE COURT: Now, I understand you didn't have the ability to self-clean the SHU cell.
During the entire 45 days, did anybody ever come in and clean it at any point while you were outside?

THE WITNESS: No. When you are in the SHU, nobody is allowed in your cell. Nobody is allowed to -- whenever you leave out, your door is getting locked. And whenever you come in, you know, it is like a -- it is kind of like an administrative segregation. So no, nobody is allowed to come inside.

THE COURT: So you mean during that 45 days, it was literally never cleaned.

THE WITNESS: At all.

THE COURT: Did they clean maybe when inmates -- let's say, for example, you are in there by yourself. How many of the 45 days did you have somebody in there with you?

THE WITNESS: Every single day. You are going to have a cellie in the SHU.

THE COURT: Do they ever clean it when one of the cells becomes empty? Let's say, for example, both of you got out on the same day. Did they come in and clean it between inmates, or would you even know?

THE WITNESS: As far as my cell, I wouldn't -- I could say no because I always had a cellie.

Now, if they do it in the other cells, that is something that I can't -- that I can't attest to.

THE COURT: Okay. All right. Ms. Fonteneau, you can continue.

Q. (By Ms. Fonteneau) Now -- and do they have people who

just clean cells as a job?
A. They have orderlies in the SHU. But the orderlies are only out at particular times because they are out of their cells, but they are still locked behind a cage also. So they only come out to help pass out trays, and that's it. But they are not permitted to bring you any books, slide you anything under the door, or none of that stuff.
Q. Now, what are some of the triggers that you have for your asthma?
A. Heat is one of them. Not being able to breathe fresh air is one of them likewise. And confined places. I think I am -- sometimes I get kind of claustrophobic and it kind of brings on some anxiety to where it kind of -- I have trouble breathing.
Q. Now, did you have any other conditions besides asthma attacks while you were in the SHU?
A. I contracted staph infection on my face.
Q. And where was the staph infection on your body?
A. It started squarely in the middle of my face and spread maybe about like that (indicating).
Q. Now, when you had the staph infection, how did it feel?
A. It was very itchy. It was -- it was draining. It had like a lot of -- I don't know if it was pus or fluid or something like that, but it would drain a lot, and it would make me feel kind of, like, nauseated and sometimes, like,

really fatigued, but I thought that was also in part because I had the asthma attacks because that, you know, was kind of something that really, like, had me feeling drained a lot.

MR. HOOD: Your Honor, having a staph infection requires a medical diagnosis, and I don't believe we have any records of that. I object.

THE COURT: Okay. I am going to take it as his personal opinion the it was a staph infection. He is testifying that he had some sort of medical condition on his forehead, and your assumption is it was a staph infection.

THE WITNESS: Actually, Nurse Gill [sic] --

THE COURT: Can you spell that or do you know how --

THE WITNESS: Her name is Rebecca Gill, J- -- not J -- G-I-L-L.

THE COURT: Okay. G-I-L-L.

All right. So Ms. Gill.

THE WITNESS: Ms. Gill. She did a round in the SHU. And back there, you can't go to medical like how you would do on the general population, so you would have to either write a note or kind of bang on the door. Just imagine 400 people banging on the door, so -- so she stopped, and I said, Hey -- I thought it was a spider bite. I said, Hey, I have this spider bite on the front of my head, and she said, No, that looks like MRSA.

But I didn't know what MRSA was. And she said, It

is staph infection. So I was, like, you know, Can I get some treatment on it? And she was like, Wait until you get out of the SHU, and come see me.

And that was -- I sent her an e-mail talking about that. I believe so.

THE COURT: Did you go see somebody after you got out of the SHU?

THE WITNESS: Yes.

THE COURT: Okay. So there might be a record of that --

THE WITNESS: There may.

THE COURT: It would have been after the SHU.

THE WITNESS: There may -- yes, yes, there may.

MR. HOOD: Your Honor, for clarification, have a look at Exhibit 7.

MS. FONTENEAU: We are about to put it up. Thank you, but if you will allow us to continue.

THE COURT: Ms. Fonteneau, you can pull it up.

MS. FONTENEAU: Yes.

THE COURT: So it's Gillman, G-I-L-L-M-A-N.

THE WITNESS: Okay. That's what it is.

THE COURT: Very good.

Q. (By Ms. Fonteneau) Okay. So is this -- now, you and -- did you write this? Well, what is this document?

A. This is an e-mail that I wrote Nurse Gillman.

Q. And what does it tell you -- what did you tell -- why are you sending this email on December 16th?

A. To confirm that I spoke with her in the SHU while I was in A Range, Cell 103, about having a bump on my face that was draining and bleeding. And I explained to her that it looked like a bite on my forehead directly between my eyes. And she seen what appeared to be a scab about the size of a nickel. And I explained to her how much it hurts and how it was causing me to have headaches, and she confirmed that it was -- I spelled it wrong. I put MSRP. But it's staph infection or spider bite. But she said it looked like a spider bite. I never received any medical treatment for it and continued to ask SHU staff to let it be known to medical. And I explained how I was released from the SHU on December 14th.

And since, the scar has came off and it is healing, but it left a small bump on my forehead. I wanted to come to medical, but since the bump is healing, I don't want staff to think I am lying about the spider bite. I want to know can you verify when I come up there so I can get some cream or medication for it. Thanks.

Q. Okay. And so you did talk to someone in medical about that condition?

A. Yes, ma'am.

Q. Okay. And then you reiterated it when you came out?

A. Yes, ma'am.

Q. Now, can you tell me just how the experience -- at the time that you had gone into the SHU, had you ever been into the SHU before?
A. No, never.
Q. Now, can you tell me, you know, how you felt when you were in the SHU?
A. I felt -- I just -- to be honest, I just -- I couldn't believe it because I just felt like I was in the SHU for something I didn't do. And I was just asking somebody to just look into it. That was it. You know, just look into it, and everybody would tell me to just go through the process.
So it was very depressing. And just, you know, I was really focused on whether this was going to affect my appeal. And it just -- and just being in there under those circumstances with the toilet and the heat and -- I don't know. I just really can't -- I really can't explain, but it was very difficult back there. Those 45 days were the worst time I have ever done in my 12 years of incarceration. Even compared to the pandemic, that was the worst time that I have ever done in the prison.
Q. Why?
A. Because the conditions that I was subjected to and the fact that no one wanted to at least hear me out or either intervene. And even during the pandemic, we were locked in cells, but we were able to flush the toilets. We were able

to, you know, purchase hygiene. We were able to get cleaning supplies like bleach and, you know, Lysol wipes. But that experience really took a toll on me. Like, I don't never want to have to go through that again.

Q. And just for completeness of the record, I would like to show Joint Exhibit 5.

Now, what is this?

A. This is a follow-up that I -- email that I wrote to the warden. It is from February 10th, 2017. And I was just letting her know that, you know, I am the guy that you spoke to while I was in the SHU about the brown paper. And I let her know how many days I was in the SHU about the amphetamines. And I let her know that I have the instructions that said that you were never to use brown paper tiles. And I explained to her that I believe -- in my opinion that SIS Harvell failed to proceed to test "W," and I pretty much broke down the fact that I was being subjected to, you know, cruel and unusual punishment because of the NIK test. And I was currently serving 28 years, and I am four and a half years into my sentence. I have a -- I have two -- it is misspelled, but I have two appeals in the court -- I have two appeals in the court and the shots -- I misspelled that -- and the shots don't look good for the judge to see.

Q. All right. After you sent Ms. Clay, Warden Clay this email, did anybody come back and retest it the way you had

asked them to try to do?
A. No. They were -- everybody was -- if they didn't tell me to just go through the process, they were telling me that -- that the BOP doesn't do retesting.
Q. Okay. I will show you Plaintiff's Exhibit 6.
A. Okay. This -- I'm sorry.
Q. What is this?
A. This is a request e-mail that I wrote to the assistant warden on December the 20th right after I got out of the SHU. It was kind of, you know, just saying the same thing I said to Warden Clay. And I was explaining that I filed a regional appeal to the office in Atlanta, but the office in Atlanta said that they weren't getting it. And I was asking them about the problems that we were having in the SHU because sometimes our mail wouldn't go out. So I kind of felt, my opinion, that maybe there was something funny going on with my appeal surrounding the Vasoline situation because the regional office wrote me and said that they had received my appeal, and I know that I sent -- I mailed it out.
Q. Now, did you ever ask Epps or Harvell or anybody else about, you know, keeping the paper that was confiscated?
A. My first time seeing Harvell was today. So Harvell, no. Epps, yes. Once I got out of the SHU, I didn't talk to Epps anymore. I just spoke to him about it then. After I got out, I just talked to the administrative staff as far as the

wardens and the captains and the assistant wardens about, you know, maybe using some discretion or maybe some power that they have under the BOP policy to at least kind of intervene to at least just try to help me out or have someone just to look at it. That's it.

Q. And do you know what, if anything, happened to the paper that had been confiscated from you?

A. With me being an inmate, it is well-known that I do not -- I'm not privy to any of that stuff. So they are going to -- I've tried to get it. In my DHO hearing, I tried to obtain it, and, you know, they will tell you that you have got to go through so many hurdles and file a FOIA request. And, you know, you are not privy to it. It's, you know, internal information. So I was never able to get my hands under it all.

Q. Do you know if it existed? Did anybody tell you where it was or anything like that?

A. Pretty much when you are a prisoner, you are an inmate, they are not going to share any of that stuff with you. They are just going to give you kind of like a standard thing to, hey, you know, it's internal things. You can't get your hands on it. If you want it, file a FOIA request, and that's pretty much it.

MS. FONTENEAU: Just a second. We may be wrapping up, Your Honor. I want to make sure.

THE COURT: Okay.

(Conferring)

Q. (By Ms. Fonteneau) Now, Mr. Jenkins, you came all the way here from Arkansas, and this is your day in court. Is there anything you want to tell the judge about what happened with a little bit of --

THE COURT: You can do that. That's fine.

Q. Yeah, so that you can explain why we are here today and what this -- what has -- how this has affected you?

THE WITNESS: Your Honor, I just want to first of all say that it may be burdensome on the Court, but this is the first time since I have been incarcerated that a court has really heard me out and not just say, hey, you are here for this, and this is how we are going to adjudge you.

So, you know, I really appreciate that. I'm somebody that has -- that was young and I made some bad decisions. I didn't make mistakes. I made bad decisions. You know, there's a difference. And I affected a lot of people. And seven of my brothers were incarcerated. One of them just passed away a couple of weeks ago. I haven't seen them since we were incarcerated. I program. I just completed four classes at Harvard in November. I studied paralegal. I help people. I do everything I'm supposed to do, and I just always -- I am not going to say that. I just feel like -- I just get the short end of the stick because no one ever sees

me for who I am. I am always judged for the crime that I committed. And I understand that it is serious. And at my trial, I never denied anything. I just said -- I agreed with what happened. I just don't agree with the charges. And that's it. Like, I have took responsibility. I didn't, you know, cooperate and try to put it on somebody else. I did what I did. The only thing I wanted to do was just do my time, hopefully get it reduced if that's possible, and be able to see my family. That's it.

I don't bother anybody. I haven't had any sanctions in 12 whole years. And that's hard in prison. And that's pretty much it.

Q. (By Ms. Fonteneau) Now, when you filed your lawsuit, you asked for some monetary damages. Can you tell the Court what you are seeking today monetarily and/or for any other relief that you want from the court?

A. Okay. Since this is my day in court, to be honest, I would like to be compensated if possible. The sum of somewhere around maybe -- around a thousand dollars or somewhere around that per day I was in the SHU, or -- and this is outside of the realm of the Court, but I am just saying it on record -- I would like to waive any monetary benefit and settle the case for $1 and just ask that the BOP put in a motion on my behalf under the compassionate release statute to have my sentence reduced by ten years. That is -- you know,

that is what I had in mind. And, you know, like I said, whatever the outcome is, I am just grateful. And I just wanted to be able to do my time and go home and see my family. That's it.

MR. HOOD: That last part, Judge, under the Federal Tort Claims Act, the only remedy he gets is monetary damages, and that's said in the case law. I don't think that's a matter you can consider.

MS. FONTENEAU: Your Honor, I am just allowing Mr. --

THE COURT: Yeah, I am going to let him continue. I think he understands that the latter thing is not something the Court can do --

THE WITNESS: Of course.

THE COURT: -- under the statute.

THE WITNESS: Okay.

THE COURT: But I think he's letting Mr. Hood know that he would be willing to let all of this go if they would talk to him about reduction.

That's how I took it. Is that fair?

THE WITNESS: Of course. Of course. It is just you have got a chance to see --

THE COURT: Your objection is sustained, but I think we are all on the same page as to what he is asking.

Q. (By Ms. Fonteneau) Is there anything else that you want

to tell the Court in your own words?

A. That -- that I just believe that sometimes you have to say something. Whether it is wrong or right or whether you perish in the process, but, you know, what I have been through was not right, but life is not fair. So, you know, I don't want -- I'm not a "woe is me" type of guy. But just -- you know, I just ask for the BOP just to be a little bit more mindful because people are already incarcerated and going through a lot of stuff in their lives. And situations like this could be something that pushes somebody over the edge to take their life. It is just, you know, through the grace of God, you know, that was not my situation. But, you know, people just deal with different circumstances in prison. You have time and you are away from your family and away from your children, so, you know, people have killed theirselves in the SHU, in the hole, like Jeffrey Epstein. It happens. So that's it. That's all I have to say.

MS. FONTENEAU: We have nothing further, Your Honor.

THE COURT: All right. I have got questions, but I am going to let Mr. Hood go first.

So, Mr. Hood, the floor is yours.

MR. HOOD: Sure.

CROSS-EXAMINATION

BY MR. HOOD:

Q. There is no scientific evidence that the NIK test in

question here yielded a "false positive" for amphetamine; isn't that true?

MS. FONTENEAU: Objection. That calls for speculation.

THE COURT: Well, he's asking if he has knowledge of whether it is true or not, so I will let him answer.

A. There are several case laws out of federal district court where they have -- federal district judges have said that they have rendered false positives in my opinion and from my research.

Q. That's your opinion. But in this case, there's no scientific evidence, is there?

A. Yes. He didn't follow the instructions.

Q. That's not evidence that the NIK test yielded a "false positive" for amphetamine in this case.

MS. FONTENEAU: Objection. I am going to -- one, I am going to object to the argumentative nature of this, and I believe it is also asked and answered.

THE COURT: I think everyone understands that there's no expert report in this case that has retested the paper to confirm or disprove that it is amphetamine. So I understand Mr. Hood's point.

Q. And there's no medical evidence of you having a staph infection while you were in the SHU. It may have been a spider bite. Was that your testimony earlier?

MR. HOOD: We were looking at Exhibit Number 7. Can we put that up?

Q. This refers to an incident where you talked to Nurse Gillman, I believe, on December the 12th of 2016. Is that correct, my interpretation?

A. Yes, sir.

Q. Okay. And you discussed whether or not you may have had a spider bite or possibly had a staph infection with Nurse Gillman, correct?

A. Yes, sir.

Q. And then you went on to say that you were released from the SHU on December the 14th, 2016; is that right?

A. Yes.

Q. And since then, the scar came off and it is healing, but it left a small bump on your forehead; is that right?

A. Yes.

Q. I want to come to medical, but since the bump is healing, I don't want the staff to think I am lying about the spider bite.

Did I read that right?

A. I think you are missing the in-between, but at this point, yes.

Q. Okay. I want to know when -- I want to know can you verify when I come up there so I can get some cream or medicine for it. Thanks.

Did I read that right?
A. That last sentence, yes.
Q. And at the top, we have an entry dated two days later on December 16th, 2016, and it is from the medical director of FCI Talladega, Mark Holbrook, Dr. Mark Holbrook, and he says, You need to make sick call and let the provider evaluate it. You can reference this email when you make sick call.
Did you do that?
A. Yes.
Q. When?
A. That following day.
Q. Have you got a record of it?
A. I don't have access to my medical records, no.
Q. Well, I would suggest to you there are no medical records.
MS. FONTENEAU: Objection, Your Honor. He can't testify.
THE COURT: Sustained.
And for the record, the way I read that is the response was the same day, not two days later. It looks like it was about three and a half hours later. It looks like Mr. Jenkins sent a message on December 16th at 6:26 a.m., and the response from health services was the same day at 9:57 a.m. But I may be reading that wrong, but that's the way it looks.

MR. HOOD: No. I think you are correct, Judge, and I was wrong.

THE COURT: But the question is -- because this is one of the questions I had written down -- did you, in fact, go up and make a sick call and actually let somebody look at it so you might get the -- you had asked at the bottom whether you could get some cream or something else.

Did you actually go up and see them and get any cream or medicine for it?

THE WITNESS: I did not get any cream, but I spoke with Dr. Holbrook.

THE COURT: Okay.

All right. Mr. Hood, you can continue.

MR. HOOD: Sure.

Q. (By Mr. Hood) There's no medical records to show that being placed in the SHU caused you to have any asthma attacks; isn't that true?

MS. FONTENEAU: Objection. Calls for speculation. He doesn't know what the medical records say. He didn't write them. He didn't complete them. He's not even -- he can't even really authenticate them.

THE COURT: Overruled. He can answer whether he has seen anything.

THE WITNESS: Could you repeat your question, please?

MR. HOOD: Sure.

Q. There's no medical records of you being -- that you being placed in the SHU caused you to have any asthma attacks; isn't that true?

A. That's not true.

Q. Why?

A. Because I had two asthma attacks while in the SHU, and the medical records -- there should be some medical records where they gave me the nebulizer breathing treatments while back there.

Q. Well, you used an inhaler for your asthma condition before you were in the SHU, right?

A. Yes.

Q. And you used your asthma inhaler while you were in the SHU, right?

A. I didn't have an asthma inhaler in the SHU.

Q. What did you have?

A. Nothing. That's why I had the asthma attacks.

Q. But aren't there records showing that your inhaler was recharged twice by medical personnel while you were in the SHU?

A. It can be recharged by medical. They have to come and pass it out and give it to you. I can't leave in the SHU. In general population, I can go to the hospital, and I can get it myself.

Q. But, again, my question is: It was recharged twice while you were in the SHU, right?
A. But it was not given to me while I was in the SHU.
THE COURT: Let me understand. Was your testimony that you didn't have the nebulizer with you in the SHU?
THE WITNESS: Yes.
THE COURT: But when you had the attacks, they brought it to you as a treatment for those two attacks?
THE WITNESS: No. They brought the actual breathing machine that --
THE COURT: Okay.
THE WITNESS: Yeah.
THE COURT: Okay. All right, Mr. Hood. Go ahead.
Q. (By Mr. Hood) Have a look at what has been previously labeled and marked as Jenkins Bates Stamp 161, which is the Bureau of Prisons Psychology Services Review.
And I am going to ask that that be marked as Government's Exhibit 209. I brought this up previously, and I have a copy for anybody that wants to read it.
MS. FONTENEAU: Your Honor, we object to this exhibit on a number of -- because we don't have -- we don't have the person who created the document here to testify about what it is and when it happened. There's no indication that Mr. Jenkins actually received it, saw it, reviewed it, or was a part of it.

THE COURT: I have got a copy.

MR. HOOD: The witness doesn't.

THE COURT: You can take it to him.

MS. FONTENEAU: And it was also not disclosed as part of the exhibits that we were to use at trial.

Then, you know, when we attempted to add a witness that was not disclosed, we were not allowed to add that witness to this.

MR. HOOD: Because we had legal objections. You gave no legal objections to this when we sent it to you.

THE COURT: Well, let me ask this question: When was this document disclosed to Plaintiff's counsel?

MS. FONTENEAU: As an exhibit, Your Honor?

THE COURT: Well, no. Just -- when was the first time you saw it, not whether it was listed as an exhibit.

My understanding, Mr. Hood -- and you can correct me -- is you are using this for impeachment purposes.

MR. HOOD: Correct.

THE COURT: Which is a permissible reason.

MS. FONTENEAU: It would be if he had -- well, Number 1, they said that they wanted to use it before he ever testified so it's not --

THE COURT: Well, I think it is because he knew what he was going to testify to.

MS. FONTENEAU: But, again, at this point, he didn't

make any testimony in this case about suicidal ideation or mental health disorders.

MR. HOOD: Well, he is claiming mental damages in this case, Judge. I mean --

MS. FONTENEAU: But there are things called "garden variety mental anguish" and there's also medically supported mental anguish. There's been no testimony on the stand about him being -- having suicidal ideation or having a mental health crisis while in the SHU. So it's not relevant to anything that he's testified to on that issue.

THE COURT: He has asked for a thousand dollars per day while he was in the SHU. What do you contend is the basis for that amount?

MS. FONTENEAU: I mean, there is mental anguish, but it is garden variety mental anguish. It is not medically supported. We don't have expert testimony about that. We do this all the time, Your Honor, in our employment cases. There's mental anguish that just is how you suffered being inside the SHU, what it felt like for you, what the conditions were that were different in how your daily life was affected. It does not have to be a medical condition or something that is medically, I guess, diagnosed to be mental anguish. It is just not the state of the law on mental anguish.

THE COURT: All right. I am going to allow it for the limited purpose of impeachment. And when we get into

posttrial briefing, you can make the argument that it is irrelevant to what you are asking for. If you are saying that all we are asking for is X and it has nothing to do with what is mentioned or the lack of, as mentioned here, it makes it irrelevant, then I can rule from there.

But I am going to allow him to ask him about it for impeachment purposes only.

All right. Mr. Hood, you can show it and go through it.

MR. HOOD: Okay. And let the record reflect, I have given a copy to opposing counsel and to the witness.

THE COURT: And it is presently on the screen so everyone can see it.

MR. HOOD: Okay. That's even better.

Q. (By Mr. Hood) Mr. Jenkins, do you recall having this interview with psychologist Dr. Andrew Anderson on December the 29th, 2016?

A. I don't recall it, but from the --

Q. Did I read it wrong?

A. I don't recall it, but from this paper in front of me, he is saying that he spoke with me, yes.

Q. Do you deny that he spoke to you?

A. No, I am not denying that he spoke to me. I am saying that I don't recall speaking to him because sometimes the medical or the psych people, they will just walk past your

cell and they won't stop. And then a lot of times, they just don't -- they don't talk to you. So I don't remember having this conversation with him, but there is a report in front of me saying that me and him talked about it.

Q. Do you deny that your condition was how he evaluated your mental status here as no significant mental health issues?

A. I don't recall speaking to him. And I am -- now that I am looking at the report, he said that this happened at 3:30. That's usually around the time when they are preparing to count prisoners. So that's why I am kind of -- it is kind of not adding up to me because I don't see how I spoke to him when --

Q. Well, it does say, The inmate was interviewed. Do you disagree with that?

A. I mean, if this is what it is saying, then -- I don't recall speaking to him.

Q. And do you recall him indicating to you that he evaluated you as satisfactory and segregation not detrimental?

A. I don't recall this, sir.

Q. Would you disagree with his evaluation that he considered your threat to others as low?

MS. FONTENEAU: Objection. It calls for speculation. He doesn't know what his threat is. He can't -- these are medical conclusions. If he wanted the doctor to be

here, they could have called him as a witness. You know, he said he didn't recall talking to him, so I don't know how he could even discuss how he came to these conclusions.

THE COURT: All right. Ms. Carrie, I have lost my live stream. So I can't -- I can't look back at exactly the phrasing of the question.

I am looking at the exhibit. It appears to me -- and, Mr. Hood, you can correct me if I am wrong -- that Dr. Anderson was interviewing Mr. Jenkins and perhaps others as to whether there was any need for psychological services --

MR. HOOD: Correct.

THE COURT: -- at that time; and that, based on his interaction with Mr. Jenkins, he determined that he did not need psychological services and that Mr. Jenkins was told how he could seek them in the future if he wanted them.

Is that pretty accurate as to what was going on?

MR. HOOD: That's fair. That's fair, Judge.

THE COURT: Remind me what your question was, then.

MR. HOOD: My last question, I think, was: Did you report any -- do you recall reporting to anyone any significant mental health problems requiring any immediate mental health intervention while you were in the SHU?

THE WITNESS: Answer?

THE COURT: You can answer.

A. Okay. The only people I remember speaking to is Warden

Clay and the assistant wardens. I don't recall speaking to the psychologist. Anderson, I don't recall speaking to him.

THE COURT: Let me ask it a different way. There was never a point when you were in the SHU that you went out and said, Hey, I need to talk to a doctor or someone about mental health or psychological problems I am having. I think that's what Mr. Hood is trying to --

THE WITNESS: Okay. Okay.

When you are back there, they hardly ever walk through. And if they do -- like, for instance, if me and my cellmate are in the cell asleep and he does a round, he's going to check off his list that he walked past everybody's cell and nobody talked to him.

THE COURT: Okay.

THE WITNESS: That's -- the majority of the time, if you are not at the door or beating on the door or trying to get someone's attention, everybody is in a rush to walk through the SHU and get out of the SHU.

THE COURT: But you never said, Hey, I need to talk to Dr. Anderson; will you send him down here?

THE WITNESS: I never said that.

THE COURT: Okay. All right. Mr. Hood.

MR. HOOD: Yes.

Q. (By Mr. Hood) You are in federal prison today for the felony charge of kidnapping --

MS. FONTENEAU: Objection, Your Honor --

THE COURT: Hold on.

Q. -- which you pled guilty --

THE COURT: Hold on. Let him finish the question.

Q. -- see Exhibit Number 207; isn't that true?

THE COURT: Now state your objection.

MS. FONTENEAU: Your Honor, it is not relevant as to why he's in federal prison. It is done here for the prejudicial effect of explaining to the Court what his legal case is and to just besmirch his character. We know that Mr. Jenkins is in prison because he committed an offense, and that's not relevant to anything in this case about whether or not the NIK test was completed as per the policies and procedures and whether or not he was put in the SHU because of it.

THE COURT: What is the purpose, Mr. Hood, of getting into the details of why Mr. Jenkins was in prison?

MR. HOOD: Well, I just want to make sure it was referenced properly, I suppose. But it's --

THE COURT: Well, I have already admitted 207.

MR. HOOD: Excuse me?

THE COURT: I have already admitted the exhibit, so the exhibit itself is in.

MR. HOOD: Well -- it is -- one more question then.

THE COURT: So I will sustain the objection.

Q. Prior to this conviction, you were also convicted of drug charges; isn't that true?

MS. FONTENEAU: Objection, Your Honor.

THE COURT: Same question: What is the -- because when I make the -- again, this is a bench trial, not a jury, so I am not going to be prejudiced by what the charges were. This is totally a relevance question.

Is there some relevance when I'm writing my opinion in which I need to say what the specific facts were that led to Mr. Jenkins' conviction?

MR. HOOD: No, Your Honor.

THE COURT: Is there any reason I need to get into those facts?

MR. HOOD: No.

THE COURT: Okay. Then sustained.

What I assume the opinion will say is: Mr. Jenkins was in prison because he was convicted in so-and-so year and then we will go from there.

All right. You can continue.

MR. HOOD: That's all the questions I have, Judge.

THE COURT: All right. I have got a few.

EXAMINATION

BY THE COURT:

Q. Mr. Jenkins, what was the brown paper? Where did it come from?

A. It was a -- it was like a -- I don't know if it was a brown napkin or a brown paper bag. I don't know which one it was, but it was like a -- like, sometimes we get, like, bag lunches, so I just -- which I know not to do now -- just took off a piece and put some Vasoline on it because my nose gets very dry and my lips get very dry.

Q. Did anyone ever come into your cell that day to see if you had Vasoline?

A. No.

Q. What happened to your goods? You said you had a locker in Sigma?

A. Yes.

Q. Where did the things go in your locker in Sigma for the time that you were in the SHU?

A. Okay. When you go to the SHU, the officer is going to pack your property out. So anything that is open is going to go in the trash can. So if my Vasoline was open, if it had one finger that was gone, it is going in the trash can. So they pack up all your property and maybe -- let's say maybe on my 39th day in the SHU, the property officer -- because mind you, he has a bunch of people whose property he's -- so he will come to your cell and have a piece of paper and say, Hey, this is all of the stuff that I got out of your locker. Do you agree with it? Is something missing? You know, and that's how the property thing works. But nobody never

checked, no.
Q. So when you came out of the SHU, there was no longer Vasoline, correct?
A. No.
Q. And you would -- and I understand this is an assumption. Your assumption would be because it had been opened under their policy, it would be thrown away.
A. Yes.
Q. How much were you making -- how many hours -- when you were in Sigma, how many hours a day on average do you think you were working?
A. Maybe, like, 13 days straight from -- mind you, we make Army pants, so there was constant need for Army and Air Force pants. So we would come to work at 6:45, and we may get off at -- we have to get off before count, so probably about 8:30. 6:45 in the morning to 8:30 at night.
Q. An hour break for lunch? Any break?
A. Yes. You get one 15-minute break, and you get a lunch break for an hour.
Q. Okay. Did they pay you for that time, or those hours didn't count?
A. They don't count because you -- it is, like, a clock-in system.
Q. So on average, perhaps, you were working about -- or billing for about 12 hours a day? In other words, they would

pay you for about that?
A. Yes.
Q. How much per hour were you making when you were in Sigma?
A. It goes on, like, a pay grade system, so I may have been making $2 an hour maybe.
Q. Okay.
A. Maybe a little bit more. A little bit more, maybe.
Q. So when you came out of the SHU, you were eligible or ineligible to go back to that job?
A. Ineligible.
Q. Was there any way that you could regain eligibility?
A. Getting your sanction expunged.
Q. Did that -- was that not one of the things that happened, that they expunged your sanction? I mean, I know they gave you the credit back. Did they not make you reeligible to work again?
A. Okay. This is how it works. Once my sanction was expunged, I think maybe a year later, now you have to wait for the BOP to actually send the information to your case manager. And then your case manager has to get it and make the -- so that may take maybe a couple of months where on record, you may -- it is vacated, but actually in the central file, it may take -- you know, it may take a while for them to get around to it.

Q. Do you remember what day or at least what month you got out of the SHU and went back?
A. December. December --
Q. '16?
A. December '16. Middle of December.
Q. But of the year 2016?
A. 2016, yes.
Q. How long did you remain at that facility? In other words, when were you transferred to somewhere else? Because you are not there now.
A. July of 2023.
Q. Okay. And you don't believe you were ever eligible again to work doing the same thing, or do you think your eligibility came back at some point? Let me ask you this: Did you ever work again once you got put back in Sigma?
A. No, because by the time -- okay. Well, first, once it gets reinstated, you have to -- pretty much, you have to start back from the bottom again. So you have to wait to see if they have an opening or, you know, kind of, you know, talk to the boss and say, well, hey, listen, you know, I know I had a run-in with the SHU, but, you know, it is -- kind of trying to convince them that you are not a knucklehead, so I did work for a little bit, and then the pandemic came and that pretty much shut it down.
Q. Did that shut down all of the work opportunities?

A. Until they -- until the CDC kind of started lifting the restrictions a little bit. It was kind of real tough within the BOP on everybody catching COVID and how they were balancing it out.
Q. Would that have been March of '20 when they shut everything down, or was it later?
A. It may have been the beginning of March of '20.
Q. Okay. Remind me -- you know, I asked you earlier about you had sent the email to health services saying that you wanted to see them about spider bites, staph infection, particularly whether to get any cream or medicine.
Did they ever give you any cream or medicine?
A. No. Dr. Holbrook just came to the lobby and just advised me to, hey, get you some cortisone cream from commissary. And that was pretty much it.
Q. Did you get any from the commissary?
A. That right -- that right there, no, I wound up getting some type of clear ointment because I don't -- I don't think -- cortisone cream is for, like, bad skin or something like that. I wound up getting some Neosporin ointment or something like that.
Q. Is it something that still bothers you today? Because I am just saying: I don't notice anything there today, but I don't -- I can't say what it would have been like at some certain time.

A. The staph infection thing, no. As far as being in the SHU, yes, because something about the doors, like when you are behind those doors and there's nothing that you can do about it, that freaks me out. It really, really freaks me out. Like, I hate being behind locked doors if I don't have to. I hate it.

THE COURT: Let me make sure I don't have anything else. All right.

Ms. Fonteneau, any follow-up?

MS. FONTENEAU: Just a second, Your Honor.

REDIRECT EXAMINATION

BY MS. FONTENEAU:

Q. Oh, yeah. Did I show you Exhibit 14? I don't know that you have seen this, but for Your Honor's benefit, this appears to be an encounter from December 9th, 2016.

Do you see that?

A. Yes.

Q. And the inmate name on there is yours, correct?

A. Yes, ma'am.

Q. And so did you -- so you did -- do you see what the assessment there says?

A. Yes.

Q. Okay. And is this one of the -- is this a day that you received treatment in the SHU?

A. Yeah. This is after my second asthma attack.

Q. Okay. Did you get -- tell me about, like -- can you tell me how the asthma attack took place?
A. The first one -- the first one, I was just kind of like in the cell, and it was, like, right after the DHO hearing. So that was -- that right there kind of started weighing heavy on me because, in the beginning, I kind of held out, like, well, maybe someone is going to really help me.
So once I went to the DHO and got convicted, it kind of sent me into kind of like a panic attack, so I, you know, kind of started breathing heavy and I kind of stood up. And I was just standing by the door, and my cellie was asking me, like, are you all right? And I was like, I should be cool.
And it was like my throat started closing up and I couldn't breathe. And it was just like a wave of anxiety came over me, so I got on the floor and I put my nose under the door because that's the only fresh air that you can get inside in there. And I was trying to, like, kind of breathe in, breathe in, breathe in some fresh air, and it just got so bad that I just collapsed.
And like I said, when you are in the SHU, nobody hardly ever walks. It's hard to get anybody to stop and talk to you about anything at all, so my cellmate began beating on the door and kicking on the door, saying, Help.
And then once he did that, everybody else in the SHU started kicking on the door saying, Help. And he said, My

cellie is having an asthma attack.

And that's when the officer got up and came -- came to my door and said, Hey, what's going on? And I explained to him, I can't breathe. I can't breathe. I can't breathe. I can't breathe. And my cellie was like: Please get him some medical help.

So he said, Give me a couple of minutes. So maybe about -- this happened at, like, 9:00 o'clock at night -- 9:00 or 10:00 o'clock at night, so it is only -- the prison is shut down, so the medical guy is -- it's a -- Talladega has a medium, and it has a camp. So the medical guy is usually at the camp, so I have to wait until he comes over.

So after about 15 minutes of waiting, they pulled me out of the cell, took me down to an empty cell. Well, it was like a -- not an empty cell but like a -- the cell they put guys that say they are going to commit suicide, they put you in there with nothing in a turtle suit. So he took me in one of those, gave me the nebulizer, and then put me right back in the cell.

That was the first asthma attack.

Q. Now, do you -- and this was after the date that the doctor allegedly came and saw you? Looking at, I guess defendant's --

A. Oh, the --

Q. The psychiatric.

A. Yeah, yeah, yeah. This second asthma attack was after the doctor said he came and talked to me, yes.

Q. Okay. Now -- and so you did, in fact, get treated for an asthma attack while you were in the SHU. And what was going on -- in your opinion, based on it being you and your body, what was going on that caused that asthma attack?

A. Anxiety. Just feeling hopeless that I'm locked inside of this cell. It is 90 degrees in here. It's hot. You know, I haven't bathed, and I just couldn't breathe. I didn't have my rescue inhaler. I didn't have my Advair. I didn't have anything. So it's -- when you are in such a small space, a small confined space and there's nothing but 90-degree heat that's just blowing and blowing and blowing, I couldn't breathe. And on this one, this is the one where I couldn't breathe, and I fell out of the bed. And that's when my cellie kicked the door again. And the officer came, and this RN, they called him Smiley, that's when he came and -- probably about 15 minutes, 15 or 16 minutes later and took me to the suicide cell and put -- gave me a nebulizer, a breathing treatment, and then put me back in the cell. But neither time did I ever receive a rescue -- my rescue inhaler, no.

Q. Can you tell the Court what it feels like or what goes through your head as you are experiencing an asthma attack?

A. You feel like you are about to die. And it feels like somebody is crushing your windpipe and you slowly are trying

to breathe, and it makes you light-headed to where you pass out. And the more you try to breathe, it is like trying to breathe through a straw being under some cement or something like that. Like, it is the worst feeling in the world because you are literally on the brink of death.

So as I'm trying to breathe and it is so hot, I can't. And my throat is getting tighter. The more I breathe in, my throat gets tighter. It gets tight. It gets tight until eventually, that's when I fell off the bed and my cellie jumped down and seen I was having an asthma attack. And that's when he kicked on the door so they could come -- so the officer could call medical.

Q. Okay. And can you tell me what it feels like to feel like you are about to die; or for you, how did it feel like to feel like you were about to die?

A. To feel like you were about to die and to feel like you were about to die in prison is even worse because you are sitting, and the only thing you want is some air. That's it. And it's going through your mind like: Oh, my God, I am about to die.

So you are thinking about your family. You are thinking about your kids. You are just thinking about: I am about to die inside of a federal prison of an asthma attack. And that -- and after you have the asthma attack, it drains -- literally drains all of the energy out of your body.

So after that, I would just lay in the bed and try to figure out, like: What am I going to do because it is obvious nobody is going to look into it and nobody is going to help it. And I just -- it just plays over in your mind. And it is just depressing and anxiety. And, I mean, it is one of the worst feelings in the world, feeling like you are going to die and feeling like you are going to die in prison. It's one of the worst feelings I've ever experienced in my life.

MS. FONTENEAU: I don't think I have anything else for this witness.

THE COURT: Mr. Hood?

MR. HOOD: Could we look at Exhibit 210?

(Conferring)

MR. HOOD: Never mind.

Judge, there seems to be some indication that he started working again in June of 2018, but it's not in our regular exhibits.

THE COURT: Is it in something that has been admitted?

MS. POSEY: It has been -- it is just in the documents that have been produced to --

THE COURT: Because I am going to give y'all the opportunity for posttrial briefing.

MR. HOOD: Okay.

THE COURT: So even if there's no testimony, if you

can point to something in the record that would indicate that -- although, I think Ms. Fonteneau is going to say: Produced documents are not the same as admitted into evidence.

MR. HOOD: I understand that.

MS. POSEY: Right, Your Honor.

THE COURT: Is that fair?

MS. FONTENEAU: And I believe he said -- I think he testified he went back at some point during -- before COVID, and then he didn't -- I mean, I don't think we dispute that.

THE COURT: When was the first time you went back to working at something after you were released from the SHU?

THE WITNESS: It had to be the summer of 2018 because the Court of Appeals reversed my conviction in February of 2017. And I left Talladega and went to a county jail in Illinois, and that's where I filed my 2241 at. So I stayed there for a year. And then when I came back, that's when I got everything situated with the good time and I started back working in UNICOR.

THE COURT: So you got out of the SHU in December of '17?

THE WITNESS: '16.

THE COURT: '16. When were you transferred to the county facility or somewhere else? In other words, when was the first time you left this facility and went somewhere else?

THE WITNESS: It had to be July 2017 is when I went

to White County Jail in Illinois.

THE COURT: And then while you were there, you filed the 2241 that was ultimately successful.

THE WITNESS: In November of that year.

THE COURT: Right. And when you came back, you regained the opportunity to work in UNICOR?

THE WITNESS: After -- you know, after they -- after my case manager, it took a couple of months before they got, you know -- because it's not just a thing where they can just call and say -- they have got to go back and forth, so yeah, probably around -- to be safe that I am not up here lying or anything, between the summer, but I am saying around fall is when I officially started back working in 2018.

THE COURT: Okay. Fall of '18.

Okay. Mr. Hood.

MR. HOOD: That's good enough.

THE COURT: That's good? All right. Anything else?

MR. HOOD: No, Your Honor.

THE COURT: Ms. Fonteneau?

MS. FONTENEAU: No, Your Honor. I don't think so.

THE COURT: All right. If y'all will help Mr. Jenkins back to his seat.

THE WITNESS: Excuse me, Your Honor. Who do I give this to (indicating)?

THE COURT: You can just leave it there, and they

will hand it to me.

(Brief pause)

THE COURT: All right. Ms. Fonteneau, any additional witnesses?

MS. FONTENEAU: No, Your Honor. We rest.

THE COURT: Okay. Any motions by the defendant?

MS. POSEY: Yes, Your Honor, the defendant moves for judgment as a matter of law pursuant to Rule 52(c) at the close of Plaintiff's case. And I would note that we are also going to move at the close of all the evidence. It is merely a matter if you want me to argue my motion now or --

THE COURT: I am assuming you are going to have no additional witnesses.

MS. POSEY: Yes, Your Honor.

THE COURT: Okay. Then what I will do is deny the first motion for the time being with -- obviously, you are going to have the opportunity to raise all of these arguments in posttrial briefing, but you have preserved your argument that you raised at the appropriate time.

MS. POSEY: Okay.

THE COURT: All right. Mr. Hood or Ms. Posey, while you are up: Does the government have any witnesses?

MR. HOOD: No, Your Honor. The government rests.

THE COURT: All right. So at this point -- well, Ms. Fonteneau, do you have any motions you want to make?

MS. FONTENEAU: We would move for judgment as a matter of law. We have proved that the employees of the Talladega FCI had a duty to test, according to the policies and procedures, with the NIK kit. Each employee who had access to the testing kit indicated that they did not follow the procedures as a matter of law. We have proved that because that testing kit was, in fact, submitted to the DHO, that it is the reason and only evidence that was put before the DHO to make the -- to make the determination to place Mr. Jenkins in the SHU. And while he was in the SHU, he suffered asthma attacks. And the conditions in the SHU were harmful to him emotionally, physically as well. We have put all that evidence into the record. There has been no evidence rebutting the fact that all of those things occurred, and so we would ask that -- for a judgment as a matter of law, as they put in no evidence rebutting our prima facie case.

THE COURT: All right. Do y'all want to -- I am going to tell you: Ultimately, I am going to deny both sides' motions to direct any verdict at this point.

What I want to do is allow Ms. Carrie time to come back with a transcript and let y'all argue it on paper when you have had time to look at everything and flesh it out.

But if you feel like there's any need to put any particular argument or motion on the record now, you can certainly do it.

MS. POSEY: Your Honor, I would note that Plaintiff has not only a negligence claim but also a malicious prosecution claim, and they have not put on any evidence to meet the first element showing that there was a prior judicial proceeding against Plaintiff. I think, you know --

MS. FONTENEAU: Your Honor, I mean, for our purposes, we proceeded on the negligence grounds.

THE COURT: Yeah. What I was going to tell you -- and I will sort of indicate it now. We are going to go over the rules for the posttrial briefing. I was going to tell you to spend all of your time on negligence anyway because the odds of winning the malicious prosecution are about zero.

Is that fair?

MS. FONTENEAU: We didn't put evidence on --

THE COURT: I know. And for the same reason, even if you got past prior judicial proceeding, I was not going to find as a matter of fact that Mr. Harvell or Mr. Epps or anyone else acted with malice and without probable cause. They may have made a mistake, and that's what y'all are going to argue about. But certainly, they weren't doing this maliciously at the time.

MS. FONTENEAU: Your Honor, we have never really made that --

THE COURT: So we are going to focus on negligence only. So on that one, you win.

You may win on both, ultimately. We will see. But as far as malicious prosecution, you are certainly going to prevail on that. And I think what we do is briefing on negligence.

So anything else you just need to make clear for the record before we talk about briefing?

MS. POSEY: No, Your Honor. I think everything else can be addressed in the briefing.

THE COURT: All right. Ms. Carrie, what is a good estimate -- and I don't think that this is a case that requires anything to be expedited.

Let's say Carrie gets it done -- what if I gave you a month, like June 13th. If I did that, how about we make -- one, two, three.

How about we say July the 12th for Plaintiff's opening or first brief?

Does the government want three weeks to respond to that? Is that enough?

MS. POSEY: Yes, sir.

THE COURT: It's the government. You are going to ask for four. It's got to go up the chain and back down, right?

How about I give you four? One, two, three, four. That would make it August the 9th.

And then two weeks for reply, August the 23rd.

Any problem with that, Tori?

LAW CLERK: The case is on the September report, but that's fine.

THE COURT: I am going to move those dates up. We have things that we have to get done as well.

So let me go back. Let's make it -- I will let's say June 21st -- June 28th for opening brief; July 19th for government response; and reply brief, if any, July 31st.

MS. FONTENEAU: Your Honor, may -- and this may kill Lacey and not me, but I am going to be in Scotland on June 28th, so either -- I think what we could do is take this on the chin and just do it before that, maybe do the 25th.

THE COURT: That would be great.

MS. FONTENEAU: Which I am sad that I said that out loud, but --

THE COURT: It is okay. Let's stick with those dates. June 28th -- I didn't write them out. I think it was June 28, July 19, July 31.

And let's make it -- do you think you can do it in 20 pages, Ms. Fonteneau?

MS. FONTENEAU: Oh, yeah. Yes, Your Honor.

THE COURT: Good. Maximum of 20 pages for your first brief, maximum of 20 for the government's first brief, and then 10 for any reply.

If you do not intend to file a reply or want to file

it early, as you can tell, that would be greatly appreciated because we have a time line as well.

MS. FONTENEAU: Yes, Your Honor.

THE COURT: All right. Anything else y'all need to take care of today before we let you go?

MS. FONTENEAU: No, Your Honor.

THE COURT: Anything from the government?

MR. HOOD: No, Your Honor.

THE COURT: Mr. Hood, we are never going to see you again, are we, at least not in official capacity?

MS. FONTENEAU: You are retiring?

MR. HOOD: Friday is my last actual day, but I have got two and half months of leave to use up so --

THE COURT: So are you saying today is, like, the day?

MR. HOOD: No. Friday is the day.

THE COURT: But you have leave. In other words, are you coming to work tomorrow? Am I outing you at this point?

MR. HOOD: No pressure.

THE COURT: All right. Anything else on the record that we need to do?

MS. FONTENEAU: Congratulations on the record.

THE COURT: Congratulations on the record.

All right. We will go off the record.

(Proceedings adjourned at 2:50 p.m.)

C E R T I F I C A T E

I certify that the foregoing is a correct transcript to the best of my ability from the record of proceedings in the above-entitled matter.

So certified on this date, June 10th, 2024.

Carrie M. Robinson

Carrie M. Robinson, RMR, CRR, CRI
Federal Official Court Reporter