UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

**ANTWON D. JENKINS,**
    Plaintiff,

v.

**Case No. 1:20-cv-1815-CLM-SGC**

**UNITED STATES OF AMERICA,**
    Defendant.

## MEMORANDUM OPINION

Antwon D. Jenkins is a federal inmate who sues the United States under the Federal Tort Claims Act ("FTCA"). Jenkins alleges that Bureau of Prison ("BOP") officials negligently or intentionally disregarded and failed to follow NIK drug test instructions when they tested a brown piece of paper soaked in some substance in Jenkins' possession and interpreted the result to indicate the presence of amphetamines. Jenkins was then sanctioned with disciplinary segregation in the Special Housing Unit ("SHU").

The court held a bench trial on Jenkins' claims of malicious prosecution and negligence. The court then had the parties file post-trial briefs on the evidence presented at trial. Below are the court's findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. *See* Fed. R. Civ. P. 52(a) ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specifically and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of evidence or may appear in an opinion or memorandum of decision filed by the court.").

For the reasons stated within, the court will **DISMISS WITH PREJUDICE** Jenkins' complaint. The court will **DENY AS MOOT** the Government's motion for judgment on partial findings (doc. 94).

**FINDINGS OF FACT**

    Antwon Jenkins is a federal inmate who was incarcerated at FCI Talladega in Talladega, Alabama from September 2014 to July 2023. (Doc. 98, p. 114). On November 1, 2016, Officer Taylor Green performed a random pat search on Jenkins. (*Id.*, p. 115). When Jenkins emptied his pockets, he gave Green a brown piece of paper that Jenkins said had Vaseline on it to help Jenkins with his chapped nose and lips. (*Id.*, pp. 115–16). Officer Green suspected that the substance was drugs, so he asked for Jenkins' prison ID and told Jenkins that he would send the brown paper to the lieutenant's office. (*Id.*, p. 117).

    Special Investigative Services ("SIS") Technician Wayne Harvell tested the brown paper from Jenkins with a NIK test kit. (*Id.*, pp. 31–32). This Identidrug chart shows how NIK tests work:



(Trial Ex. 15, p. 1).

The instructions require the tester to start with Test A, observe the color changes in the solution, and by process of elimination conduct other tests until the solution suggests the presence of a tested substance. (*Id.*, p. 2).

The NIK test kit instructions also have specific requirements for testing liquids:

> **Liquid samples** – NIK tests are NOT designed for use with liquid samples. However, liquids may be tested by placing the tip of an NIK SUBSTANCE LOADING DEVICE or a 1cm square (roughly 1/2" square) piece of paper into the liquid. Remove and allow to air dry. Place the dry paper into the test pack and proceed with the test as instructed. The choice of paper is critical. Unscented, uncolored filter paper is ideal. NEVER use brown paper, hand towels or newsprint.

(*Id.*) (emphasis added). Among other things, Jenkins bases his breach of duty argument on the highlighted instruction: "NEVER use brown paper."

That's because Harvell tested brown paper. Harvell could not extract the liquid substance from the brown paper. (Doc. 98, p. 90). So Harvell cut a small piece of the brown paper that Officer Green took from Jenkins and placed it in the solution for Test A. (*Id.*, pp. 33, 72). The solution quickly turned orange to brown and eventually turned black. (*Id.*, pp. 88–89). From Harvell's experience of performing over 100 NIK tests, he knew that suspect material would always turn black the longer it sat in the solution. (*Id.*, pp. 41–42, 72–73). And because the solution first turned orange and then brown, he then tested another piece of the confiscated paper under Test U, which came next in the sequence. (Doc. 98, p. 72; Trial Ex. 15).

The solution in Test U turned a reddish-purple color, so Harvell determined that the substance on Jenkins' paper was presumptively positive for amphetamines. (Doc. 98, p. 2; Trial Ex. 21). Harvell based this determination on the Identidrug chart's suggestion that a reddish-pink color in Test U meant that the substance was likely amphetamine:



(Trial Ex. 15, p.1). But Harvell admits that he did not read footnote 2 of the Identidrug chart:

> Only after Test A goes from orange to brown AND Test U turns can you presumptively identify the substance of an amphetamine-type compound. Red in Test U alone does NOT indicate amphetamine-type compounds.

(*Id.*). Nor did Harvell test the brown paper under Test W, which tests for amphetamine and methadone. (Doc. 98, p. 84; Trial Ex. 16, p. 62).

After Harvell found that Jenkins' brown paper tested positive for amphetamine, Jenkins was ordered to report to Lieutenant William Epps' office. (Doc. 98, p. 118). Epps informed Jenkins that his paper tested positive for amphetamine and provided Jenkins with an incident report. (Doc. 98, pp. 118–19; Trial Ex. 18). Jenkins responded that the paper had Vaseline on it and that he did not possess amphetamines. (Trial Ex. 18, pp. 1, 3). But Epps found that there was enough evidence to forward Jenkins' incident report to a Disciplinary Hearing Officer ("DHO") for further review. (Doc. 98, pp. 98–99; Trial Ex. 18, p. 3).

A disciplinary hearing was held two weeks later. (Trial Ex. 8). After the hearing, the DHO found that Jenkins committed the prohibited act of possessing narcotics, relying on the NIK test kit results to support his findings. (*Id.*, p. 3). The DHO then sanctioned Jenkins with 30 days of disciplinary segregation in the SHU, the loss of 41 days of good time credit, and the loss of visitation privileges for a year. (Doc. 87, p. 4).

After Jenkins filed a habeas petition under 28 U.S.C. § 2241, the BOP expunged his disciplinary sanction for possession of narcotics and restored his visitation rights and good time credits. (*Id.*). But Jenkins' disciplinary sanction wasn't expunged until after his disciplinary segregation had ended. At trial, Jenkins testified that he was subject to unsanitary conditions at the SHU that caused him to suffer asthma attacks, develop a staph infection, and have emotional distress. So Jenkins sues the United States under the FTCA for negligence and malicious prosecution, alleging that prison officials didn't follow the NIK test kit's instructions when testing the brown paper they confiscated from him.

## CONCLUSIONS OF LAW

The FTCA allows private individuals to sue the United States for injuries caused by negligent or wrongful acts of a government employee "acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). So the court will apply Alabama law to Jenkins' claims for malicious prosecution and negligence. *See Ochran v. United States*, 273 F.3d 1315, 1317 (11th Cir. 2001).

### A.   Malicious Prosecution

To establish malicious prosecution, a plaintiff must show: "(1) that a prior judicial proceeding was instituted by the present defendant, (2) that in the prior proceeding the present defendant acted without probable cause and with malice, (3) that the prior proceeding ended in favor of the present plaintiff, and (4) that the present plaintiff was damaged as a result of the prior proceeding." *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831–32 (Ala. 1999). Jenkins concedes that he hasn't presented evidence that establishes malicious prosecution. (Doc. 98, p. 187). The court agrees. There was no evidence presented at trial that suggested that any BOP official acted with malice towards Jenkins. So the court will dismiss Jenkins' malicious prosecution claim with prejudice.

5

### B. Negligence

In Alabama, "[t]he necessary elements for recovery under a negligence theory are duty, breach of that duty, proximate cause, and injury." *Rutley v. Country Skillet Poulty Co.*, 549 So. 2d 82, 85 (Ala. 1989). Jenkins bears the burden of proving each of these elements by a preponderance of the evidence. *See Johnson v. Florida*, 348 F.3d 1334, 1347 (11th Cir. 2003).

1. <u>Duty</u>: "The existence of a duty is determined by a number of factors, including (1) the nature of the defendant's activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened." *Taylor v. Smith*, 892 So. 2d 887, 892 (Ala. 2004) (quotations omitted). "The *key* factor is whether the injury was *foreseeable* by the defendant." *Id.*

Jenkins asserts that Harvell had a duty to exercise reasonable care in following the NIK test kit instructions and that Lieutenant Epps had a duty to verify that the procedures were followed correctly. The United States doesn't dispute that the BOP owes a general duty of care to prisoners or that unjustified inmate punishment is a foreseeable result of an erroneous prison drug test. But the United States argues that Jenkins' alleged injuries of asthma attacks, staph infection, and emotional distress were not foreseeable to Harvell or Epps.

The fact that a federal employee failed to follow federal regulations or guidelines doesn't establish that the Government is liable under the FTCA. *Zelaya v. United States*, 781 F.3d 1315, 1324 (11th Cir. 2015). But federal statutes, regulations, and guidelines "may provide the standard of care against which the government's conduct should be assessed." *Id.*; *see also Lands v. Ward*, 349 So. 3d 219, 223 (Ala. 2021) ("In a negligence action, it is possible for a legal duty imposed by statute or regulation to inform the common-law standard of reasonable care or to supplant it entirely."). It is BOP policy to test suspected contraband with a NIK test kit by following the test kit's instructions. (Doc. 98, p. 100–02). And the NIK training material stresses that "[d]eviating from [the test kit's procedures] will give an inconclusive answer or may put the officer or observers at risk." (Trial Ex. 16, p. 2). So the court finds that the NIK test kit's instructions, procedures, and protocols inform the duty Harvell and Epps owed Jenkins.

The court also finds that it was foreseeable to Harvell and Epps that failing to follow the NIK test kit's protocols could injure Jenkins. As stated, the Government concedes that unjustified inmate punishment is a foreseeable result of an erroneous prison drug test. And "[f]oreseeability does not require that the particular consequence should have been anticipated, but rather that some general harm or consequence should have been anticipated." *Lands*, 349 So. 3d at 226. The court thus finds that Jenkins has established that (a) Harvell owed Jenkins a duty to exercise reasonable care in following the NIK test kit's instructions, and (b) that Epps owed Jenkins a duty to exercise reasonable care in verifying that Harvell followed the NIK test kit protocols.

2. Breach of Duty: Jenkins alleges that Harvell and Epps breached the standard of care by not following these procedures: (1) Harvell failed to follow the Identidrug chart; (2) Harvell failed to measure the paper he used to make sure that it was the right size for testing; (3) Harvell used brown paper to test the liquid substance; (4) Epps moved forward with discipline without verifying that Harvell used the proper procedures for the NIK test; and (5) BOP did not consult an outside lab or use urinalysis testing.

*a. Failure to follow Identidrug chart:* Jenkins says that Harvell failed to follow the Identidrug chart in three ways. First, Jenkins argues that Harvell failed to correctly apply the chart's footnote 2:

> Only after Test A goes from orange to brown AND Test U turns can you presumptively identify the substance of an amphetamine-type compound. Red in Test U alone does NOT indicate amphetamine-type compounds.

(Trial Ex. 15, p. 1, n.2). According to Jenkins, this footnote means that a substance turning red following Test U does not indicate amphetamines and instead tells the tester that the substance is *not* methamphetamines.

The court disagrees. The second page of the Identidrug chart states: "A blue result in Test U confirms the presence of Methamphetamine. A reddish-pink or negative result in Test U indicates an Amphetamine-type compound. Only by following the proper sequence of tests from A to U is a positive result obtained." (*Id.*, p. 2). Plus, the NIK test kit training materials say that if the substance turns burgundy it is an amphetamine:

> The logic to be used here is that Test A (if it shifts from Orange to Brown) tells us that the substance is either Amphetamine or Methamphetamine. Test U then tells us if we have Amphetamine (primary amine/burgundy) or Methamphetamine (secondary amine/dark blue) present. By not turning dark blue and staying burgundy, this is considered a negative reaction for the presence of a secondary amine (Methamphetamine) and therefore it is an amine (Amphetamine).

(Trial Ex. 16, p. 56). So despite footnote 2's statement, that "Red in Test U alone does NOT indicate amphetamine-type compounds," the court finds that Harvell did not breach the standard of care by finding that Jenkins' paper was positive for amphetamines because it turned a reddish-pink color.

Second, Jenkins says that the only way for Harvell to determine whether amphetamine was present was to use Tests I and W, and Harvell did not. Again, the court disagrees. Test W, which does test for amphetamine and methadone, comes into play only if Test I is the appropriate test to give after Test A. (Trial Ex. 15, p. 1). And Test I is to be used only when the substance immediately turns brown after Test A. (*Id.*). Because the paper seized from Jenkins turned orange and then brown, Harvell was under no duty to perform Tests I and W on the suspected substance. Instead, Test U is the correct test to use when a substance quickly changes from orange to brown. (*Id.*). So the court finds that Harvell applied the proper test to the paper seized from Jenkins. And as explained, both the Identidrug chart itself and the NIK test kit training materials say that a substance that goes from orange to brown following Test A and turns reddish-pink after Test U is likely an amphetamine, which is what Harvell found.

Third, Jenkins says that Harvell shouldn't have performed Test U because his paper went from orange to brown to black. But Harvell explained at trial that in his experience, NIK test kits always eventually turn black. (Doc. 98, pp. 41–42, 72–73). The court finds Harvell's testimony credible and thus determines that Harvell properly performed Test U because after he performed Test A, the suspected substance turned orange and then brown.

*b. Failure to measure paper*: Jenkins asserts that Harvell breached the duty of care by not making sure that the paper he tested was the proper size for testing. The NIK test kit instructions say to test a liquid sample on a 1 cm square (or roughly 1/2" square) piece of paper. (Trial Ex. 15, p. 2). Harvell cut off a size of the piece of brown paper confiscated from Jenkins to test the liquid substance on the paper. (Doc. 98, pp. 31–33). But Harvell did not measure the paper he used for the test and could not tell the court the exact size of the paper he used. (*Id.*). Instead, Harvell could remember only that he used a small piece of paper to conduct both Test A and Test U. (*Id.*, pp. 33–34). Jenkins, however, has not offered evidence that would establish the size of the paper Harvell used for either Test A or Test U. So Jenkins hasn't established by a preponderance of the evidence that Harvell in fact used the wrong size of paper. Thus, the court finds that Jenkins hasn't shown that Harvell breached the standard of care.

*c. Use of brown paper*: The NIK instructions also say that the choice in paper is critical when testing a liquid sample and to never use brown paper, hand towels, or newsprint. (Trial Ex. 15, p. 2). So Jenkins says that Harvell shouldn't have tested the brown paper with the NIK test. The court agrees with the United States that the NIK test kit instructions related to brown paper address different circumstances than the one Harvell faced. These instructions tell testers to not place a piece of brown paper into a liquid substance for testing. They do not explain what to do if the suspected substance is already on a piece of brown paper that it cannot be extracted from. Nor did Harvell's training materials tell him what to do if he received soaked brown paper. (Doc. 98, pp. 90–91). So Harvell tested what he had believing that this was the best he could do in that situation. (*Id.*). Under these circumstances, the court finds that Jenkins hasn't established by a preponderance of the evidence that Harvell's testing of the brown paper was a breach of duty. *See Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala. 1995) ("Negligence is the . . . doing of something that a reasonably prudent person would not have done under the same or similar circumstances.").

*d. Failure to verify procedures*: Jenkins next says that Epps breached his duty to verify that Harvell followed the correct procedures and that there was enough evidence to move forward with disciplining Jenkins.

For example, Jenkins asserts that Epps shouldn't have approved moving forward with discipline when he saw that brown paper was used in the investigation. As explained, Jenkins hasn't shown that Harvell failed to follow the procedures applicable to the testing of the brown paper seized from Jenkins. So the court finds that Jenkins hasn't established by a preponderance of the evidence that Epps breached the standard of care by moving forward with Jenkins' discipline based on Harvell's NIK test.

*e. Failure to conduct further testing*:   Jenkins finally says that Harvell should've performed more than one NIK test. Jenkins also says that BOP officials breached their duty to Jenkins by not submitting the brown paper for laboratory testing or performing a urinalysis test on Jenkins.

As Jenkins points out, the NIK test training materials say that "two tests are better than one, three better than two, etc." (Trial Ex. 16, p. 7). But the training materials say this in the context of explaining why using a series of progressively discriminating test starting with Test A minimizes the chance of false positives. (*Id.*, pp. 6–7). And both the Identidrug chart and training materials instruct testers to continue from test to test until a positive or negative result is obtained. (Trial Ex. 15, p. 2; Trial Ex. 16, p. 31). They do not instruct testers to test presumptively positive substances multiple times. So the court finds that Harvell did not breach a duty owed Jenkins by only once performing Tests A and U.

Nor does the court find that Harvell, Epps, or any other BOP official breached their duty to Jenkins by not submitting the brown paper for laboratory testing or performing a urinalysis on Jenkins. Harvell testified that the NIK test kit is the only test kit that BOP uses on suspected drugs and that it is not part of BOP procedure to send substances to labs for further testing. (Doc. 98, p. 36). He also said it's "not protocol to give" inmates a urinalysis test after finding an unknown liquid on a piece of paper. (*Id.*, p. 55). And Lieutenant Epps testified that whether BOP officials follow up a NIK test with a urinalysis test depends on the circumstances. (*Id.*, pp. 95–96). So the court finds that there is no NIK test kit instruction or BOP policy that specifically told Harvell or Epps whether further testing was needed. Because Harvell and Epps had discretion over whether to order further testing and decisions about the discipline of inmates is the type of discretionary function that Congress

10

exempted from the FTCA's waiver of sovereign immunity, the court finds that the discretionary function exception to the FTCA bars Jenkins from bringing a claim based on the failure to conduct laboratory or urinalysis testing. *See Shivers v. United States*, 1 F.4th 924, 928–31 (11th Cir. 2021).[1]

—

In sum, Jenkins has failed to establish that Harvell, Epps, or any other BOP employee breached the duty of care.

3. <u>Proximate Cause</u>: Even if Jenkins has shown a breach of the duty of care, he hasn't established by a preponderance of the evidence that this breach of duty proximately caused his alleged injuries. Under Alabama law, "[p]roximate cause is an act or omission that in a natural and continuous sequence, unbroken by any new independent causes, produces the injury and without which the injury would not have occurred." *Lemley v. Wilson*, 178 So. 3d 834, 842 (Ala. 2015).

Jenkins' alleged injury is that he was unfairly placed in disciplinary segregation because Harvell incorrectly performed the NIK test, resulting in a false positive for amphetamines. To support his assertion that he did not possess amphetamines, Jenkins points to (a) his testimony that the substance on the brown paper was Vaseline, and (b) the BOP's decision to expunge Jenkins' disciplinary sanction after he filed his § 2241 petition. But the record does not establish that interpreting the NIK test instructions the way Jenkins does or performing the test differently would have changed the test result. For example, Jenkins hasn't shown that Harvell's failure to measure the size of paper he tested or the use of brown paper caused the substance to turn reddish-pink. Nor has Jenkins shown that performing Tests I and W, conducting a urinalysis, or sending the sample to an outside lab would have confirmed or undermined the test results. As a result, the court finds that Jenkins hasn't met his burden to establish proximate causation.

---

[1] The discretionary function exception doesn't apply to the other breaches of duty that Jenkins alleges because these alleged breaches all relate to the alleged failure to follow a specific NIK test kit instruction. *See Shivers*, 1 F.4th at 931 ("[T]here is no discretion to exercise when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." (quotations omitted)).

—

Because Jenkins hasn't met his burden to establish breach of duty or proximate cause by a preponderance of the evidence, the court will dismiss Jenkins' negligence claim with prejudice without addressing whether Jenkins has established damages.

## CONCLUSION

For the reasons stated within, the court will **DISMISS WITH PREJUDICE** Jenkins' complaint. The court will **DENY AS MOOT** the Government's motion for judgment on partial findings (doc. 94).

The court will enter a separate final order that carries out this ruling and closes this case.

**DONE** and **ORDERED** on September 6, 2024.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE